APRIL L. HOLLINGSWORTH (Bar No. 9391)
ASHLEY LEONARD (Bar No. 14899)
**HOLLINGSWORTH LAW OFFICE, LLC**
1115 South 900 East
Salt Lake City, Utah 84105
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
ashley@aprilhollingsworthlaw.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DENILE GALE,**<br><br>        Plaintiff,<br><br>vs.<br><br>**UINTAH COUNTY,** a political subdivision of the State of Utah, and **UINTAH COUNTY ATTORNEY LOREN W. ANDERSON,** and **SHERIFF JEFF MERRELL,** in their official and individual capacities**,**<br><br>        Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:13-cv-725<br>Judge Tena Campbell<br><br>**ORAL ARGUMENT REQUESTED** |

        Plaintiff Denile Gale, by and through his counsel, submits this Memorandum in

Opposition to Defendants' Motion for Summary Judgment, pursuant to Fed. R. Civ. P.

56.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... vi

GENERAL RESPONSE TO DEFENDANTS' SUMMARY JUDGMENT MOTION
AND MEMORANDUM ...................................................................................... viii

RESPONSE TO STATEMENT OF ELEMENTS AND MATERIAL FACTS ......... xi

   I.   DENIAL OF DUE PROCESS ................................................................ xi

     A.  Legal Elements ................................................................................. xi

     B.  Material Facts ................................................................................ xxiv

   II.   RETALIATION IN VIOLATION OF THE FIRST AMENDMENT ..... xxxiv

     A.  Legal Elements ........................................................................... xxxiv

     B.  Material Facts ................................................................................... xl

   III.   LOREN ANDERSON'S IMMUNITY .................................................. xli

     A.  Legal Elements ............................................................................... xli

     B.  Material Facts ................................................................................. xlv

STATEMENT OF ADDITIONAL ELEMENTS .................................................. xlvi

STATEMENT OF ADDITIONAL MATERIAL FACTS ................................... xlviii

ARGUMENT ....................................................................................................... 1

   I.  PROCEDURAL DUE PROCESS .............................................................. 1

   A.  Mr. Gale did not waive his procedural due process claim. ................. 1

   B.  Mr. Gale has a property interest in his position with the Uintah County
Sheriff's Office. ................................................................................. 3

   C.  Mr. Gale was not afforded procedural due process because the process in
place is deficient. ............................................................................... 3

   D.  Defendants' additional reasons for Mr. Gale's termination violate his
procedural due process rights and should be ignored. ......................... 6

   II.  SUBSTANTIVE DUE PROCESS ........................................................... 9

     A.  It is arbitrary and capricious to hold an employee to the letter of a policy
when a different, standard practice is in place. ................................... 10

**B.   It is arbitrary and capricious to selectively enforce discipline for a written policy that was not being practiced, while applying inconsistent rules and punishment for similar, and in some cases more egregious, conduct.** ................ 11

**III.    FIRST AMENDMENT RETALIATION** ......................................... 13

**A.   Defendants retaliated against Mr. Gale for his protected speech.** ................ 14

**B.   Defendants retaliated against Mr. Gale for his protected political affiliation…** ................................................................................................... 15

**IV.    IMMUNITY** ............................................................................... 18

**CONCLUSION** ................................................................................. 20

**CERTIFICATE OF SERVICE** .......................................................... 21

# TABLE OF AUTHORITIES

## Federal Cases

*Albright v. Rodriguez*, 51 F.3d 1531 (10th Cir. 1995)…………………………………..xlv

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)………………………………..xxxv

*Arnett v. Kennedy*, 416 U.S. 134 (1974)…………………………………………………...xix

*Baca v. Sklar*, 398 F.3d 1210 (10th Cir. 2005)……………………………………...xxxviii

*Bass v. Richards*, 308 F.3d 1081 (10th Cir. 2002)……………………………...xxxviii, 16

*Benavidez v. City of Albuquerque*, 101 F.3d 620 (10th Cir. 1996)………...xlvi, xlvii, 3, 4

*Bertsch v. Overstock.com*, 684 F.3d 1023 (10th Cir. 2012)…………………………xxxix

*Bjorklund v. Miller*, 467 Fed. Appx. 758 (10th Cir. 2012)………………...xxi, xxii, 4, 5

*Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975)…………………………………...xiii

*Brown v. Day*, 555 F.3d 882 (10th Cir. 2009)……………………………………xii, xvi, 1

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)…………………………………………xliii

*Burns v. Harris Co. Bail Bond Bd.,* 139 F.3d 513 (5th Cir. 1998)……………………...xiv

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)……………xii, xix, xlvii, 4, 7

*Connick v. Myers*, 461 U.S. 138 (1983)……………………………………………..xxxvii

*Copple v. City of Concordia, Kan.,* 814 F. Supp. 1529 (D. Kan. 1993)……………….xiv

*Daniels v. Williams*, 474 U.S. 327 (1981)………………………………………………..xi

*David v. City & County of Denver*, 101 F.3d 1344 (10th Cir. 1996)………....xlvii, 18, 19

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (10th Cir. 2006)…………………………………………………………………………………xxxix

*F.D.I.C. v. Noel*, 177 F.3d 911 (10th Cir. 1999)…………………………………....18

*Garrity v. New Jersey*, 385 U.S. 493 (1967)……………………………………...xxxvii

*Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999)……………………xl

*Harris v. Blake,* 798 F.2d 419 (10th Cir. 1986)………………………………...xxii, 9

*Horstkoetter v. Dep't of Public Safety*, 159 F.3d 1265 (10th Cir. 1998)………………...14

*Imbler v. Pachtman*, 424 U.S. 409 (1976)…………………………………………..xliii

*Jantzen v. Hawkins*, 188 F.3d 1247 (10th Cir. 1999)…………………………….passim

*Kalina v. Fletcher*, 522 U.S. 118 (1997)…………………………………………....xliv

*Kingsford v. Salt Lake City School Dist.*, 247 F.3d 1123 (10th Cir. 2001)…………..xix, 3

*Kosidowski v. County of Washington*, Civil No. 2:06-CV-903, 2010 WL 564894 (D. Utah Oct. 26, 2010)……………………………………………………………...…..xxiii, 9

*Laidley v. McClain*, 914 F.2d 1386 (10th Cir. 1990)…………………………….....17

*Lee v. Regents Of Univ. of Cal.*, 221 Fed. Appx. 711 (10th Cir. 2007)…………………..2

*Maestas v. Segura*, 416 F.3d 1182 (10th Cir. 2005)………………………….....xxxix

*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324 (10th Cir. 1996)………………………...xxxviii

*Mathews v. Eldridge,* 424 U.S. 319 (1976)…………………………………….xlvi, 4

*McDaniels v. Flick*, 59 F.3d 446 (3d Cir. 1995)………………………………….xxii

*Mink v. Suthers*, 482 F.3d 1244 (10th Cir. 2007)………………………….....xliii, xliv

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971)……………………………...xxxvi, 14

*Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997)…………………………....xxxix

*Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986)……………………………………………………………………….xv, 1

*Parratt v. Taylor*, 451 U.S. 527 (1981)…………………………………….xi, xii, xiii

*Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052 (10th Cir. 2009)…………….....13

*Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas*, 869 F.2d 555 (10th Cir. 1989)…………………………………………………………....xii, xiv, 1

*Proctor v. United Parcel Service*, 502 F.3d 1200 (10th Cir. 2007)…………………..xxxix

*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995)…………………………….xl

*Roberts v. Kling*, 104 F.3d 316 (10th Cir. 1997)………………………………….xliv

*Sky Harbor Air Service, Inc. v. Reams*, 491 Fed. Appx. 875 (10th Cir. 2012)…………..13

*Smith v. Town of Eaton*, 910 F.2d 1469 (7th Cir. 1990)…………………………....xxiii, 9

*Tapia v. Beffort*, No. CIV–02–0513, 2003 WL 24130246 (D. N. M. Nov. 26, 2003)………………………………………………………………...ix, x

*Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504 (10th Cir. 1998)…...xxii, xxiii, xxiv, 4, 9

*United States v. Williamson*, 806 F.2d 216 (10th Cir. 1986)…………………….....xiv, 1

*West v. Grand County*, 967 F.2d 362 (10th Cir. 1992)………………....xvi, xviii, xix, 3

*Williams v. Berney*, 519 F.3d 1216 (10th Cir. 2008)………………………….xxiii, xxiv

*Zinermon v. Burch*, 494 U.S. 113 (1990)……………………………....xiv, xlvi, 1, 2, 3

## State Cases

*Becker v. Sunset City*, 309 P.3d 223 (Utah 2013)………………………………………7

*Buckner v. Kennard*, 2004 UT 78, 99 P.3d 842……………………....viii, ix, xvii, xviii

*Fierro v. Park City Mun. Corp.*, 2012 UT App 304, 295 P.3d 696……………………7

*Knight v. Salt Lake County*, 2002 UT App 100, 46 P.3d 247………………………….xviii

## Statutes

Utah Code Ann. §17-30-1, *et seq*……………………………………………....xviii, xxiv, 3

Utah Code Ann. §17-33-1, *et seq*..…………………………………………………....xviii

## INTRODUCTION

Denile Gale ("Mr. Gale") worked as a Corporal for the Uintah County Sheriff's Office Corrections Division from January 1995, until he was terminated on December 22, 2011. Mr. Gale was terminated after 16 years of employment with the County, ostensibly for giving Uintah County jail inmates Ibuprofen. Mr. Gale had a solid employment record throughout his tenure with Uintah County. In 2010, however, Mr. Gale campaigned for a candidate for Sheriff against Sheriff Jeff Merrell ("Sheriff Merrell"). Mr. Gale's candidate lost the Sheriff race, and afterwards Sheriff Merrell, acting through other Uintah County Jail employees, began systematically retaliating against Mr. Gale. The retaliation culminated in Mr. Gale's termination in December 2011.

After Sheriff Merrell was re-elected in 2010, Mr. Gale filed several grievances concerning the way Sheriff Merrell treated him. The County took no action in protecting Mr. Gale from retaliation. Instead, the County looked for ways to get rid of Mr. Gale. In October 2011, the County launched an investigation into Mr. Gale for handing out prescription-strength Ibuprofen ("IBU 800's") to inmates, something he had been doing for 17 years. Mr. Gale had no notice that he was violating any Sheriff's Office, Jail, or County policy, and the Jail's past practice of distributing IBU 800's supported Mr. Gale's actions. Additionally, Amber Williams, the Jail's Medical Officer, directed Mr. Gale, among other Jail employees, to hand out IBU 800's, and the County became aware through the investigation that Ms. Williams had given inmates the wrong medications and prescriptions.  Nonetheless, the County did not investigate or discipline Ms. Williams or anyone else, and instead, terminated Mr. Gale for his first "offense."  In addition, the

County knew other Jail employees were involved in more egregious policy violations, such as two Sheriff's Office employees who were violating the "fraternization" policy, but dismissed the seriousness of that misconduct and refused to investigate those offenses.

Mr. Gale attempted to follow the grievance process in appealing his termination, but the County unilaterally waived several steps in the grievance process, denying Mr. Gale the opportunity for complete due process under the law. In addition, the County refused to provide Mr. Gale with complete discovery before his appeal hearing, and when the appeal hearing took place, the County did not make any of Mr. Gale's witnesses available, and only part of the hearing was recorded.

Summary judgment must be denied because there are genuine issues of material fact concerning all of Mr. Gale's claims. The totality of the evidence allows for a fact-finder to determine that Uintah County and Sheriff Merrell denied Mr. Gale substantive due process by selectively enforcing discipline, despite the fact that other Jail employees engaged in the same conduct and were not fired. Uintah County and Sheriff Merrell also denied Mr. Gale procedural due process when they failed to provide him the appropriate levels to appeal his termination, as provided in County policies. In addition, Mr. Gale was denied procedural due process because Defendants failed to give him a fair and complete appeal hearing. Finally, based on the disputed facts, Uintah County and Sheriff Merrell retaliated against Mr. Gale after he campaigned for another candidate for Sheriff; this retaliation ultimately resulted in Mr. Gale's termination. Because a reasonable jury could find for Mr. Gale on all of his claims, summary judgment should be denied.

## GENERAL RESPONSE TO DEFENDANTS' SUMMARY
## JUDGMENT MOTION AND MEMORANDUM

Defendants' Motion for Summary Judgment and Memorandum in Support (dock. no. 33), while complying with the Federal Rules of Civil Procedure, does not comply with the Rules of Professional Conduct.  Portions of Defendants' "Statement of (Legal) Elements" is taken from case law that was not originally cited to in Defendants' brief. After Mr. Gale's counsel pointed out the problem to Defendants' counsel and sent them a highlighted copy of the brief showing the problem, Defendants attempted to correct their error with an Errata (dock. no. 39), but left the two most serious violations untouched.  A copy of the brief with the language highlighted that still does not properly cite to the authority from which it came is attached as Exhibit A.

Specifically, some of the plagiarized material omits relevant legal authority which is contrary to Defendants' position. For example, Defendants use a passage taken directly from *Buckner v. Kennard*, 2004 UT 78, 99 P.3d 842, but do not cite to *Buckner*, while at the same time they omit *Buckner*'s language that is helpful to Mr. Gale in this case. Defendants' Summary Judgment Memorandum states:

> Utah cases have dealt directly with the nature of public employment, and held that the employment of civil servants in Utah is governed by statute, not contract. *Knight v. Salt Lake County*, 2002 UT App 100, P9, 46 P.3d 247; *Hom v. Utah Dep't of Pub. Safety*, 962 P.2d 95, 101 (Utah Ct. App. 1995). Corrections officers are statutory employees and their discipline is governed by the County Personnel Management Act (the CPMA), Utah Code Ann. §§ 17-33-1 to-15 (2001).

Dock. no. 33 at 8. Defendants did not address this passage in their Errata, but the entirety of this passage from *Buckner* states:

> Two recent Utah cases have dealt directly with the nature of public
> employment, and both have held that the employment of civil servants in
> Utah is governed by statute, not contract. *Knight v. Salt Lake County,* 2002
> UT App 100, ¶ 9, 46 P.3d 247; *Hom v. Utah Dep't of Pub. Safety,* 962 P.2d
> 95, 101 (Utah Ct. App. 1998). The deputies are statutory employees; their
> selection, promotion, and compensation are governed by the Deputy
> Sheriffs' Merit System Act (the Merit Act), Utah Code Ann. §§ 17–30–1 to
> –24 (2001), and the County Personnel Management Act (the CPMA), Utah
> Code Ann. §§ 17–33–1 to –15 (2001). *See Knight,* 2002 UT App 100 at ¶ 9,
> 46 P.3d 247. However, there may be circumstances in which the
> government voluntarily undertakes an additional duty that it would
> otherwise have no obligation to perform, in which case an implied contract
> arises imposing that duty. *Id.* at ¶ 10; *Piacitelli v. S. Utah State Coll.,* 636
> P.2d 1063 (Utah 1981).

*Buckner*, 2004 UT at ¶ 32. Defendants omit the language referring to the Sheriffs'

Merit System Act U.C.A. § 17-30-1, *et. seq.* and the common law regarding when

a government "voluntarily undertakes an additional duty." *Id.*  This is a violation

of Rule 3.3 of the Utah Professional Rules of Conduct. After contacting

Defendants' counsel about this passage, among others, Defendants did not take the

opportunity to correct this important error.

Another example appears in both Defendants' Summary Judgment Motion and

their Errata. In the "Law Regarding Waiver of a Due Process Claim" section, Defendants

cite to *Tapia v. Beffort*, No. CIV–02–0513, 2003 WL 24130246 (D. N. M. Nov. 26,

2003), but actually change part of a quote to better fit Defendants' own argument. *Tapia*

reads:

> Although the state remedies may not provide the respondent with all the
> relief which may have been available if he could have proceeded under §
> 1983, that does not mean that the state remedies are not adequate to satisfy
> the requirements of due process. The remedies provided could have fully
> compensated the respondent for the property loss he suffered, and we hold

that they are sufficient to satisfy the requirements of due process. *Id.* The Supreme Court thus articulated the premise that Tapia's due process claim must fail where he did not avail himself of *an appeal to the New Mexico State Personnel Board*.

*Tapia*, 2003 WL 24130246, at *5 (emphasis added). Defendants' Summary Judgment Motion keeps the same language as *Tapia*, except Defendants change "New Mexico State Personnel Board" to "state district court." *See* dock. no. 33 at 4; dock. no. 39 at 3. Defendants therefore attempt to mislead this court by replacing language in the case law with language they created to help their waiver argument.   In the Errata, Defendants add the previously omitted cite to *Tapia*, but did not correct the mis-quote regarding "state district court."

The pattern of plagiarism, exacerbated by omitting relevant legal authority which is detrimental to Defendants' case, clearly violates the Rules of Professional Conduct. Coupled with the fact that the majority of Defendants' "Argument" section makes no reference to any facts in the record and consists of merely conclusory statements,[1] Defendants' brief as a whole falls far short of this Circuit's standard for summary judgment motions. Mr. Gale requests that this court sanction Defendants' conduct by denying summary judgment for all of Mr. Gale's claims and awarding Mr. Gale his costs and fees for responding to Defendants' Summary Judgment Motion.

---

[1] For example, Defendants' "Argument for Summary Judgment on Cause of Action Two," which are Mr. Gale's First Amendment claims, does not cite to any evidence in the record at all. The entire argument consists of conclusory allegations. *See* dock. no. 33 at 37-41.

## RESPONSE TO STATEMENT OF ELEMENTS AND MATERIAL FACTS

### I.   DENIAL OF DUE PROCESS

#### A.   Legal Elements[2]

##### 1.   <u>Waiver of a Procedural Due Process Claim</u>[3]

- The Supreme Court of the United States has held that, where adequate state remedies exist to address deprivations of property caused by state actors, the provisions of 42 U.S.C. § 1983 will not apply.

**Response:** Disagreed to the extent that Defendants attempt to make this a blanket rule that is applicable to this case. *Parratt* concerned a state prisoner's loss of $23 worth of hobby materials, and the prison warden's liability for that (negligent) loss. The Supreme Court held that 42 U.S.C. § 1983 was not an appropriate claim when a State employee negligently took a State prisoner's property because "the State of Nebraska had a tort claims procedure, which provided a remedy to persons who suffered tortious losses at the hands of the State." *Parratt v. Taylor*, 451 U.S. 527, 530 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1981)). The prisoner's claim alleged facts "that are commonly thought to state a claim for a common-law tort normally dealt with by state courts . . . ." *Id.* at 533. Because Nebraska's tort claims procedure provided "a means of redress for property deprivations," the requirements for procedural due

---

[2]   To more clearly address the disputes regarding Defendants' presentation of the legal elements related to each claim, Mr. Gale has separated Defendants' paragraphs into individual statements of the law, as noted by the bullet points in each "Legal Elements" sections.

[3] Defendants do not distinguish between Mr. Gale's procedural and substantive due process claims in their argument regarding "Waiver of a Due Process Claim," but the case law is specific to an individual's right to *procedural* due process. *See Parratt v. Taylor*, 451 U.S. 527 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327 (1986)). Regardless of Defendants' waiver argument, which Mr. Gale disputes is applicable to this case, Mr. Gale's substantive due process claim should not be affected at all.

process were satisfied. *Id.* at 537. A public employee's procedural due process claim,

however, is commonly dealt with by 42 U.S.C. § 1983 claims in federal courts. *Cleveland*

*Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985). The Tenth Circuit has held that a

plaintiff with a § 1983 claim does not have to exhaust remedial state remedies prior to

bringing a claim in federal court. *Brown v. Day*, 555 F.3d 882, 884-85 (10th Cir. 2009).

- Although noting that simple negligence was probably inadequate to satisfy § 1983's state action requirement, the Supreme Court reasoned that existing state law remedies provide the due process mandated by the Constitution to address deprivation of property at the hands of state actors. Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process. The remedies provided could have fully compensated the respondent for the property loss he suffered, and we hold that they are sufficient to satisfy the requirements of due process. *Id.* The Supreme Court thus articulated the premise that a plaintiff's due process claim must fail where he did not avail himself of an appeal to a state district court.

**Response:** Disagreed. As stated above, *Parratt v. Taylor* dealt with a prisoner's rights to

redress based on prison officials' negligence in losing his property, and does not stand for

the proposition that a public employee must appeal the employee's termination in state

district court instead of bringing Fifth Amendment and Fourteenth Amendment due

process claim(s) under 42 U.S.C. § 1983. The *Parratt* court emphasized:

> It seems [] there is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers. In the former situation the facts satisfy the most literal reading of the Fourteenth Amendment's prohibition against 'State' deprivations of property.

*Parratt*, 451 U.S. at 542 (quoting *Bonner v. Coughlin*, 517 F.2d 1311, 1319 (7th Cir.

1975)). In addition, the *Parratt* court distinguished other cases where plaintiffs alleged

additional Constitutional violations, such as violations of the Fourth Amendment and

Eighth Amendment. *Id.* at 536. The *Parratt* plaintiff "refer[ed] to no other right,

privilege, or immunity secured by the Constitution or federal laws other than the Due

Process Clause of the Fourteenth Amendment *simpliciter.*" *Id.* Here, Mr. Gale has

asserted violations of the First Amendment and Fifth Amendment, in addition to

violations of the Fourteenth Amendment of the U.S. Constitution.

- The Court of Appeals for the Tenth Circuit has gone a step further by holding that "unless state law fails to afford [the plaintiff] adequate process, he has no federal constitutional claim to begin with." The Tenth Circuit stated that its holding was not based on exhaustion of remedies, but rather focused exclusively on the existence of a federal claim. ("Thus, our holding here is not that [the plaintiff] must exhaust his claim before he has a federal cause of action . . . ").

**Response:** Disagreed. *Pitts* concerned a public school tenured teacher whose contract

was not renewed for the upcoming school year. *Pitts v. Bd. of Educ. of U.S.D. 305,*

*Salina, Kansas*, 869 F.2d 555 (10th Cir. 1989). The teacher expressly waived his right to

a pre-termination hearing, as outlined in Kansas procedure, and instead chose to file a

federal lawsuit under 42 U.S.C. § 1983 for violations of due process. *Id.* at 557. Because

the teacher "knowingly failed to take advantage" of the pre-termination hearing available

to him, the teacher waived his right to file a federal lawsuit. *Id.* Defendants' quote from

*Pitts* refers to the fact that Kansas law afforded the teacher due process through a pre-

termination hearing, and since the teacher failed to take advantage of that process by

waiving his right to a pre-termination hearing in writing, he could not bring a federal

constitutional claim for denial of that process. *Id.* Notably, the *Pitts* court emphasized,

"'[c]ourts indulge every presumption against the waiver of fundamental constitutional

rights.'" *Id.* (quoting *United States v. Williamson*, 806 F.2d 216, 219 (10th Cir. 1986)).

- Regardless whether the Court views the issue as involving waiver or whether a federal cause of action exists, a plaintiff cannot pursue a due process claim in Federal Court when he failed to utilize the state remedies available to him.

**Response:** Disagree with Defendants' characterization of the law. Defendants cite to

*Parratt* again, which Mr. Gale disputes in Response to the first and second bullet points

above. Mr. Gale also disputes Defendants' representation of *Pitts*, as explained in

Response to the third bullet point. Additionally, the Supreme Court has held,

"overlapping state remedies are generally irrelevant to the question of the existence of a

cause of action under § 1983." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990). The *Copple*

decision cited by Defendants concerned an employee's failure to file a grievance of his

termination, not whether an employee must file a lawsuit in state court as opposed to

federal court. *Copple v. City of Concordia, Kan.,* 814 F. Supp. 1529, 1538-39 (D. Kan.

1993). Finally, the *Burns* decision Defendants rely upon is a Fifth Circuit case, which has

no binding authority on this court. *Burns v. Harris Co. Bail Bond Bd.,* 139 F.3d 513 (5th

Cir. 1998). Additionally, *Burns* is inapplicable to this case because the *Burns* plaintiff, a

bail bondsman, never appeared before an appeal board regarding the plaintiff's

bondsman-agent license. *Id.* at 519.

- Utah Code Ann. § 17-33-4(1) sets forth the state remedies that were available to Plaintiff and states in relevant part:
  **(a)    (i)** There shall be in each county establishing a system a three-member bipartisan career service council appointed by the county executive. The members of the council shall be persons in sympathy with the application of merit principles to public employment.

(ii)    (A) The county executive may appoint alternate members of the career service council to hear appeals that one or more regular career service council members are unable to hear.

(B) The term of an alternate member of the career service council may not exceed one year.

(b) The council shall hear appeals not resolved at lower levels in the cases of career service employees suspended, transferred, demoted, or dismissed as well in the cases of other grievances not resolved by the grievance procedure at the division or departmental level.

(c) The career service council: (i) may make an initial determination in each appeal whether the appeal is one of the types of matters under Subsection (1)(b) over which the council has jurisdiction; (ii) shall review written appeals in cases of applicants rejected for examination and report final binding appeals decisions, in writing, to the county legislative body; (iii) may not hear any other personnel matter; and (iv) may affirm, modify, vacate, or set aside an order for disciplinary action.

(d)    (i) A person adversely affected by a decision of the career service council may appeal the decision to the district court. (ii) An appeal to the district court under this Subsection (1)(d) is barred unless it is filed within 30 days after the career service council issues its decision. (iii) If there is a record of the career service council proceedings, the district court review shall be limited to the record provided by the career service council.

(iv) In reviewing a decision of the career service council, the district court shall presume that the decision is valid and may determine only whether the decision is arbitrary or capricious.

**Response:** Agreed to the extent that Utah Code Ann. § 17-33-4(1) sets out a *noncompulsory* process for individuals affected by a decision of a career service council. Disagreed to the extent that Defendants suggest Mr. Gale waived his right to file a 42 U.S.C. § 1983 claim in federal court. The Supreme Court has made clear that plaintiffs do not need to exhaust noncompulsory administrative remedies before filing a §1983 claim in federal court. *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627-28 n. 2 (1986). The Tenth

Circuit has followed the Supreme Court precedent. *Brown v. Day*, 555 F.3d 882

(10th Cir. 2009).

### 2. Procedural Due Process

- Courts are required by long-established precedent to engage in a two-part inquiry when considering whether a plaintiff was denied procedural due process when terminated by an employer: (1) Did the individual possess a protected interest to which due process protection was applicable; and (2) was the individual afforded an appropriate level of process?

**Response:** Agreed.

### a. Property Interest

- In order to establish that he was discharged in violation of his procedural due process rights, Plaintiff is required to prove that he had a property interest in continued employment with the County.

**Response:** Agreed. "[W]hen a person's employment can be terminated only for specified

reasons, his or her expectation of continued employment is sufficient to invoke the

protections of the Fourteenth Amendment." *West v. Grand County*, 967 F.2d 362, 366

(10th Cir. 1992).

- In *Board of Regents v. Roth*, the United States Supreme Court explained that to have a property interest in a particular benefit, one must establish more than "an abstract need or desire" or "a unilateral expectation" that he or she will receive it. Instead, property interests involve "legitimate claim[s] of entitlement." Although protected property interests "extend well beyond actual ownership of real estate, chattels, or money," they do not arise from the federal constitution, but from independent sources, such as state law.

**Response:** Agreed, but irrelevant. "[W]hen a person's employment can be terminated

only for specified reasons, his or her expectation of continued employment is sufficient to

invoke the protections of the Fourteenth Amendment." *West*, 967 F.2d at 366 (collecting

cases). Mr. Gale's employment could only be terminated for specified reasons, per

U.C.A. § 17-30-18.

- Statutes, ordinances, contracts, implied contracts, as well as rules and policies developed by government officials *may* all create such interests. *Calhoun v. Gaines*, 982 F.2d 1470, 1473-74 (10th Cir. 1992).

**Response:** Agreed.

- Applying *Roth*, the Tenth Circuit Court of Appeals has concluded, in the employment context, that a property interest is "a legitimate expectation in continued employment."

**Response:** Agreed.

- Under the applicable Utah law, unless there is an employment contract with a definite term of duration, employment is presumed to be at-will.

**Response:** Agreed.

- This presumption, however, "can be overcome by an affirmative showing by the plaintiff that the parties . . . impliedly . . . agreed to terminate the relationship for cause alone." *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044 (Utah 1989).

**Response:** Agreed, but irrelevant, since Mr. Gale could only be terminated for cause.

- It is Tenth Circuit precedent that "'an entitlement to nothing but procedure . . . cannot be the basis for a property interest.'"

**Response:** Agreed, but irrelevant.

- Utah cases have dealt directly with the nature of public employment, and held that the employment of civil servants in Utah is governed by statute, not contract. [This is one of the examples in which Defendants took language directly from a case to which they did not cite (*Buckner v. Kennard*, 2004 UT 78, ¶ 32), but also omitted language that is important to this case, as explained in the response.]

**Response:** Disagreed. Civil servant employees are governed by statute, except when a

"government voluntarily undertakes an additional duty," or there is an agreement that

"alter[s] or add[s] to the terms and conditions of public employment." *Buckner v.*

*Kennard*, 2004 UT 78, ¶32, 99 P.3d 842; *Knight v. Salt Lake County*, 2002 UT App 100,

¶8, 46 P.3d 247.

- Corrections officers are statutory employees and their discipline is governed by the County Personnel Management Act (the CPMA), Utah Code Ann. §§ 17-33-1 to -15 (2001). The CPMA states, in part, as follows:
  It is the policy of this state that each county may establish a personnel system administered in a manner that will provide for the effective implementation of the following merit principles:
    (1) recruiting, selecting, and advancing employees on the basis of their relative ability, knowledge, and skills, including open consideration of qualified applicants for initial appointment;
    (2) provision of equitable and adequate compensation;
    (3) training of employees as needed to assure high-quality performance;
    (4) retention of employees on the basis of the adequacy of their performance, and separation of employees whose inadequate performance cannot be corrected;
    (5) fair treatment of applicants and employees in all aspects of personnel administration without regard to race, color, religion, sex, national origin, political affiliation, age, or disability, and with proper regard for their privacy and constitutional rights as citizens;
    (6) provision of information to employees regarding their political rights and prohibited practices under the Hatch Act; and
    (7) provision of a formal procedure for processing the appeals and grievances of employees without discrimination, coercion, restraint, or reprisal.

**Response:** Disagreed. Utah Code Ann. § 17-30-1 *et. seq.* governs deputies in county

sheriffs' offices. In addition, because the CPMA is noncompulsory and Uintah County

established additional duties towards its employees, corrections officers' terms and

conditions of employment may be governed by alternative disciplinary standards and

procedures. *See* Utah Code Ann. §§ 17-30-18; 17-33-1; 17-33-3; *Buckner*, 2004 UT 78

¶32; *Knight*, 2002 UT App 100 ¶8; *West*, 967 F.2d at 366. "'The right to due process is

conferred, not by legislative grace, but by constitutional guarantee. While the legislature

may elect not to confer a property interest in [public] employment, it may not

constitutionally authorize the deprivation of such an interest, once conferred, without

appropriate procedural safeguards.'" *Loudermill*, 470 U.S. at 541 (quoting *Arnett v.*

*Kennedy*, 416 U.S. 134, 167 (1974) (POWELL, J., concurring in part and concurring in

result in part)).

- To create a property interest in continued employment with the County, Plaintiff must point to some agreement or law giving him a legitimate claim of entitlement to the employment.

**Response:** Agreed. U.C.A. §17-30-18 confers a continued expectation of employment for

deputies in the Uintah County Sheriff's Office because "there are substantive restrictions

on the ability of the employer to terminate the employee." *Kingsford v. Salt Lake City*

*School Dist.*, 247 F.3d 1123, 1129 (10th Cir. 2001); U.C.A. § 17-30-8. "[W]hen a

person's employment can be terminated only for specified reasons, his or her expectation

of continued employment is sufficient to invoke the protections of the Fourteenth

Amendment." *West*, 967 F.2d at 366 (collecting cases).

       b.  <u>Unfair Procedure</u>

- As the Tenth Circuit has noted on many occasions, "[f]ederal courts do not sit to second guess state decision on the merits of a discharge decision, but only to ensure that employees are provided due process when the decision is made."

**Response:** Agreed.

- The law states that if an employee has a constitutionally protected property interest in employment, the Due Process Clause of the United States Constitution includes a guarantee of fair procedure.

**Response:** Agreed.

- A procedural due process claim brought pursuant to § 1983 does not allege that the deprivation by state action of a constitutionally protected property interest is in

itself unconstitutional. It is the deprivation of the employment interest without due process of law that is allegedly unconstitutional.

**Response:** Agreed.

- "[T]he root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."

**Response:** Agreed.

- Nonetheless, "[t]here are . . . some situations in which a postdeprivation hearing will satisfy due process requirements." "It is by now well established that due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." Rather, it "is flexible and calls for such procedural protections as the particular situation demands."

**Response:** Agreed.

i.    *Pre-Termination Due Process Requirements*

- The seminal case out of the United States Supreme Court on the issue of a public employee's constitutionally protected due process rights is *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

**Response:** Agreed, but irrelevant.

- *Loudermill* held that a public employee with a constitutionally protected right in continued employment may not be terminated without a hearing ***prior*** to his termination.

**Response:** Agreed.

- "Such a hearing requires: (1) oral or written notice to the employee of the charges against him; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to present his side of the story."

**Response:** Agreed.

- However, "[a] full evidentiary hearing is not required prior to an adverse employment action; it suffices that the employee is given notice and an opportunity to respond." Even a brief, face-to-face meeting with a supervisor can

satisfy the pre-termination due process requirements of *Loudermill*, provided that it affords some notice of and opportunity to contest the grounds for termination.

**Response:** Agreed.

    *ii.     Post-Termination Process Requirements*

- A court must evaluate the constitutionality of post-termination process in light of the pre- termination procedures it follows.

**Response:** Agreed.

- When the pre-termination process offers little or no opportunity for the employee to present his side of the case, the procedures in the post-termination hearing become much more important. Such a post-termination hearing represents the only meaningful opportunity the employee has to challenge the employer's action, and requiring a dismissed employee to prove in this context that he was terminated without just cause may increase the risk of an erroneous deprivation. It is often difficult to prove a negative, and where the pre-termination process has been minimal, the employee's fate may depend entirely upon the post-termination hearing. . . . In contrast, when the employee has had a meaningful opportunity to explain his position and challenge his dismissal in pre-termination proceedings, the importance of the procedures in the post-termination hearing is not as great. In this type of post-termination hearing, simply giving the employee "some opportunity" to present his side of the case "will provide a meaningful hedge against erroneous action."

**Response:** Agreed.

- To the extent the state provides more elaborate procedures *prior* to termination than are required under *Loudermill*, it need not duplicate them after termination.

**Response:** Agreed.

- "The decisionmaker in a pre-termination hearing need not be impartial, so long as an impartial decisionmaker is provided at the post-termination hearing."

**Response:** Disagreed to the extent that this statement of law is not a clearly recognized rule in all circuits, let alone the Tenth Circuit. *See Bjorklund v. Miller*, 467 Fed. Appx. 758, 765-66 (10th Cir. 2012); *McDaniels v. Flick*, 59 F.3d 446, 459-60 (3d Cir. 1995)

(explaining circuit split). Under Tenth Circuit precedent, "employees with a property

interest *do* have a right to an unbiased pre-termination decision-maker." *Bjorklund*, 467

Fed. Appx. at 765 (emphasis in original).

3. Substantive Due Process

- Like procedural due process, the threshold determination for a substantive due process claim is whether the plaintiff has a property interest in continued employment.

**Response:** Agreed. "The Due Process Clause not only provides a procedural safeguard

against deprivations of life, liberty, and property but also protects substantive aspects of

those interests from unconstitutional restrictions by government." *Harris v. Blake,* 798

F.2d 419, 424 (10th Cir. 1986).

- A public employee with a property interest in continued employment has a substantive due process right to not be terminated for arbitrary or capricious reasons. Therefore, a substantive due process claim, if viable, requires assessing whether a governmental action is arbitrary, irrational, or shocking to the contemporary conscience.

**Response:** Disagreed. In addition to being "arbitrary," or "capricious," a termination of a

public employee's property interest cannot be "without a rational basis." *Tonkovich v.*

*Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998). Furthermore, the "shocking to

the contemporary conscience" test is used interchangeably with the "arbitrariness"

standard, and does not create a higher burden for plaintiffs. *See id.* at 528-29.

- In *Camuglia v. City of Albuquerque*, the Tenth Circuit held that an arbitrary deprivation of a property right may violate the substantive component of the Due Process Clause, but only if the arbitrariness is extreme.

**Response:** Agreed. In addition, "[a]n act is said to be arbitrary and capricious when it is

done for reasons that are trivial, unrelated to his or her employment or wholly

unsupported by a basis in fact." *Kosidowski v. County of Washington*, Civil No.

2:06CV903, 2010 WL 564894, at *2 (D. Utah Oct. 26, 2010) (citing *Smith v. Town of*

*Eaton*, 910 F.2d 1469, 1472 (7th Cir. 1990)).

- "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." There is no question that a high level of outrageousness is required.

**Response:** Disagreed. The "shocking to the contemporary conscience" test is used

interchangeably with the "arbitrariness" standard, and does not create a higher burden for

plaintiffs. *Tonkovich*, 159 F.3d at 528-29.

- In *Camuglia*, the Tenth Circuit stated, "[t]he ultimate standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges. It is well settled that negligence is not sufficient to shock the conscience. In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. According to the Tenth Circuit, these limits reflect the need to restrict the scope of substantive due process claims, the concern that § 1983 not replace state tort law, and a need to give deference to local policymaking.

**Response:** Agreed.

- The conduct alleged "must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power . . . . [It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." "Not surprisingly, little governmental action is held unconstitutional under th[is] formulation[ ]."

**Response:** Disagreed. Defendants' cited case law centers on "whether a § 1983 plaintiff

can successfully assert a substantive due process right to be free from intentional use of

force by a state actor not authorized to use force," which is inapplicable to this case.

*Williams v. Berney*, 519 F.3d 1216, 1221 (10th Cir. 2008) (emphasis omitted).  *Williams*

does recognize, however, "[t]he case law also recognizes official conduct may be more

egregious in circumstances allowing for deliberation . . . than in circumstances calling for

quick decisions . . . ." *Id.* at 1220-21.

- A former employee's substantive due process claim, if viable, requires assessing whether a governmental employer's termination was arbitrary, irrational, or shocking to the contemporary conscience.
- 

**Response:** Repetitive, but agreed.

- In other words, the question presented is whether the discipline at issue was "a rational response to the problems posed by" the employee's behavior. If it was, there is no substantive due process violation.

**Response:** Agreed. In addition to being "arbitrary," or "capricious," a termination of a

public employee's property interest cannot be "without a rational basis." *Tonkovich*, 159

F.3d at 528.

### B. Material Facts

1. Plaintiff began his service for the Uintah County Sheriff's Office in the Corrections Division in January, 1995.  (Complaint at ¶ 6.)  He was a Corporal when he was terminated on December, 2011. (*See id.* at ¶ 7.)

**Response:**  Undisputed, but to clarify, as a "Corporal," Mr. Gale was a deputy of the

Sheriff's Office, and therefore covered by the Sheriffs' Merit System Act, U.C.A. § 17-

30-1, *et seq.  See* Gale's ID card, attached hereto as Exhibit B.

2. Uintah County Sheriff's Office policy 1-600.00, "Law Enforcement Code of Ethics" states that, as a law enforcement officer, Plaintiff would "be exemplary in obeying the laws of the land and the regulation of [his] department." (*See* Sheriff's Policy Manual, at P. 2, attached hereto as Exhibit 1.)

**Response:**  Undisputed.

3. On August 29, 2008, Plaintiff signed his Job Description as a Corrections Division Corporal which states: "Essential Functions, Corrections: Supervises inmates in

county jail in accordance with established policies, regulations and procedures while assuming responsibility for all needs (physical, medical, etc.) of the prisoners during detention; issues medications as prescribed by physicians." (Plaintiff's Initial Disclosures at Gale 000033, attached as Exhibit 2.)

**Response:**  Disputed, since the document Defendants attached does not include a

signature page or date.

4. Policy H 05.02.00 (A) of the Uintah County Jail Policies and Procedures Manual states as follows: "Prescription drugs to be distributed to prisoners are provided to the jail by licensed pharmacists following the issuance of a written prescription from a certified and licensed physician or physician's assistant." (*See* Jail Policy at Uintah County 0980, attached as Exhibit 3.)

**Response:**  Undisputed, but irrelevant; Mr. Gale is not accused of providing drugs to the

jail.

5. Policy H 05.02.00 (B)(3) of the Uintah County Jail Policies and Procedures Manual states as follows:  "Prescription medication shall be considered as the inmate's  personal property, and limited access shall be granted as provided in this section." (*See id*.)

**Response:**  Undisputed.  Further, it is important that Jail administration was aware that

the medical officer, Amber Williams, had violated this policy in several ways, but did not

discipline her.  When Leonard Isaacson was investigating Mr. Gale for providing

Ibuprofen to inmates, inmate Scott Peterson told him that some of his refills had

disappeared, and that Amber Williams brought another inmate who was supposed to have

a refill available on his Ibuprofen prescription "a yellow pill and said it was just like

Ibuprofen," and crossed another name off the prescription form and wrote his name on it;

and that he had once received an Ibuprofen that had a different inmate's name on it.

Additional Material Fact 18 ("AMF").  Mr. Peterson also told Mr. Isaacson that he was

aware that another inmate has an Ibuprofen prescription that is not his, and identified

Williams as giving that inmate someone else's prescription. *Id*. Mr. Peterson indicated that Ms. Williams had provided him with Ibuprofen out of "the drawer" without a prescription. *Id*. Merrell testified that he read this interview of Mr. Peterson as part of his decision to terminate Mr. Gale. Dock. no. 33-18 at 55:23-25. Merrell did not initiate an investigation of Ms. Williams based on this information, and is not aware of Ms. Williams ever being disciplined. *Id*. at 33:18-23; Additional Material Fact 20.

6.   Policy H 05.03.00 (C) of the Uintah County Jail Policies and Procedures Manual states as follows: "A daily record shall be kept with regard to all medication that access is granted to inmates." (*See id*. at Uintah County 0982.)

**Response:**  Undisputed, but incomplete.  The practice of the officers was inmates did not have to sign for 800 mg Ibuprofen when it was "property of the jail" like those that Ms. Williams left in the drawer to be used, as opposed to an inmate's prescription. *See* Dock. no. 33-6 at Uintah County 300-305; *see also* Interview with Denile Gale, dock. no. 33-10, at 25-26, 29 (Uintah County 1402-03, 1406).  He further explained that some of the "on-stock" medications had inmate's names on them, but the officers sometimes crossed them out when the medications were overstock and therefore became property of the jail. *Id*. at Uintah County 1403, 1405.

7.   On July 22, 2010, a Medical Directive was given to all corrections officers which directed, among other things, that "[n]o prescription medication will be given to an inmate without verification of a current and unexpired prescription in that inmate's name." (*See* Medical Directive, Ex. 3 to Pl. Dep., attached hereto as Exhibit 4.)

**Response:**  Mr. Gale disputes that this Directive was "given to all corrections officers." Mr. Gale does not remember ever seeing the July 22, 2010 "directive" until after he was

terminated.  Dock. no. 33-5 at 27-28.  One of his fellow officers, Stephanie Jones, also does not think that there were "any actual written changes to the policy and procedures" from 2009 to 2014, when she worked for the jail, and she does not remember any written policies at all concerning distributing prescription medications.  Dock. no. 33-20 at 14-15.

8.  On October 2, 2011, Plaintiff accessed a blister pack of 800 mg. prescription strength ibuprofen that was prescribed to another inmate and gave at least three of the pills to multiple other inmates who did not have a prescription for that drug. (*See* Pl. Dep. at pp. 53:17-55:9, 56:13-58:10, 59:16-61:4, 61:18-63:17, attached hereto as Exhibit 5; *see also* Transcript of Pre-Disciplinary Hearing at Uintah County 0288-0289, attached hereto as Exhibit 6.) When handing out the prescription strength ibuprofen referenced above, Plaintiff did not get signatures from the inmates to whom he gave the drugs. (*See* Pl. Dep. at P. 66:2-8 and Pre-Disciplinary Transcript at Uintah County 0289.)

**Response:**  Undisputed.  Further, not only Mr. Gale, but another officer testified that the practice at the jail was that officers could provide inmates with the "on-hand" medications, including Ibuprofen 800s, without getting permission to give them out. Dock. no. 33-20 at 17:16-18:18.

9.  Plaintiff admits that one cannot buy 800 mg. tablets of ibuprofen without a written prescription from a doctor. (Pl. Dep. at P. 65:14-66:1.)

**Response:**  Undisputed.

10. When it was determined that the 800 mg. ibuprofen pills were missing, an internal investigation was commissioned and conducted by Detective Leonard Isaacson. (*See* Detective Isaacson Dep. at pp. 12:8-14:6, attached hereto as Exhibit 8; *see also* Detective Isaacson Report, Uintah County 0180-0187, attached hereto as Exhibit 9.)

**Response:**  Undisputed.

11. After his investigation, Detective Isaacson determined that plaintiff Denile Gale accessed another inmate's prescription drugs and, without permission from a

medical provider, distributed multiple pills to inmates who did not have a prescription for such, and did not get signatures for the dispersal in violation of sections H 05.03.00 (c.1, c.2 and c.3); H 05.04.00 (c and d); H 06.07.00 (A.1.a); and H 07.03.00(B.8) of Uintah County Jail Policy. (*See* Isaacson Report at 0187-188; *see also* Jail Policy, Ex. 3 hereto.)

**Response:**  Disputed.  First, Mr. Gale disputes that the policies Detective Isaacson ostensibly determined that Mr. Gale violated are irrelevant here, because in his Notice of Pre-Disciplinary Hearing, he was informed that the County policies he violated were only H 05.03.00-C(1) and (2), and H 05.04.00-C, D.  Dock. no. 33-11 at 1.  The Termination Notice states that he violated Uintah County Jail Policy H056.00.00 (which does not exist).  Dock. no. 33-12. Defendants' statement is also disputed because it is incomplete. Detective Isaacson's investigation uncovered evidence that other Jail employees, including the medical officer, Amber Williams, were violating County and Jail policy. Specifically, Inmate Casey Bryant told Mr. Isaacson that some staff do not watch inmates take their medications, such as sleeping pills and muscle relaxants, so inmates trade the pills for phone time.   Dock. no. 33-10 at  pp. 16-17 (Uintah County 213-14).  Inmate Scott Peterson informed Isaacson that the officers only watch inmates take their medications about 80% of the time.  Dock. no. 33-8 at p. 74 (Uintah County 248).  He informed Mr. Isaacson about his refills disappearing, and an instance in which Amber Williams brought another inmate who was supposed to have a refill available on his Ibuprofen prescription "a yellow pill and said it was just like Ibuprofen," and crossed another name off the prescription form and wrote his name on it, and that he had once received an Ibuprofen that had a different inmate's name on it.  *Id*. at 75 (Uintah County 249).  Mr. Peterson also told Mr. Isaacson that he was aware that another inmate has an

Ibuprofen prescription that is not his, and identified Williams as giving that inmate

someone else's prescription. *Id*. Mr. Peterson indicated that Ms. Williams had provided

him with Ibuprofen out of "the drawer" without a prescription. *Id*. at 77 (Uintah County

251).

12. In conducting his investigation, Detective Isaacson interviewed Gale, as well as
    several other individuals. (*See* Isaacson Report generally; *see also* Isaacson Dep.
    at pp. 16:11, 30:11, 48:25-49:7; *see also* Transcripts of Isaacson Interviews of
    Logan Clark, Casey Bryant and Denile Gale, attached hereto as Exhibit 10.)

**Response:**  Undisputed. *See also* Peterson Interview, dock. no. 33-8 at 66-79; Williams

Interview at Exhibit F; Lucero Interview at Exhibit G.

13. On December 16, 2011, Plaintiff received a Notice of Pre-Disciplinary Hearing
    from Sheriff Merrell. (Pl. Dep. at pp. 77:7-79:4; Pre-Disciplinary Hearing Notice,
    which was Exhibit 8 to Pl. Dep., attached hereto as Exhibit 11.) The Pre-
    Disciplinary Hearing Notice set forth the allegations against Plaintiff, the policies
    that Plaintiff allegedly violated, gave him the opportunity to defend against those
    allegations, to bring a witness if need be, and set the hearing for December 22,
    2011. (*See* Pl. Dep. at 78:3-22; *see also* Pre- Disciplinary Notice.)

**Response:**  Undisputed; specifically, the Notice of Pre-Disciplinary Hearing states that

the allegation against Mr. Gale is that he provided an Ibuprofen 800 "to inmates that were

not entitled to the prescribed medication."  Dock. no. 33-11 at Uintah County 335.

14. On December 22, 2011, Sheriff Merrell conducted a Pre-Disciplinary Hearing
    with Plaintiff regarding the allegations set forth in the Notice of Pre-Disciplinary
    Hearing. (*See* Pl. Dep. at pp. 79:1-80:1; *see also* Transcript of Pre-Disciplinary
    Hearing at Uintah County 0284-0318, 301-3.)

**Response:**  Disputed.  The allegations Sheriff Merrell raised with Mr. Gale in the Pre-

Disciplinary Hearing were different than those set forth in the Notice of Pre-Disciplinary

Hearing.  Specifically, at the actual hearing, Merrell indicated the allegations were

"dispensing – giving out – prescription medications which is regulated by law um, and

not logging those medications or having those medications signed for.  Um. . .I also have

questions about medical records on our computer."  Dock. no. 33-6 at UC 287.  Sheriff

Merrell then explained that medical records had disappeared, and stated he wanted Mr.

Gale to explain "what you think happened to those records."  *Id.*

> 15. During his Pre-Disciplinary Hearing with Sheriff Merrell, Plaintiff addressed
> allegations that he had improperly distributed prescription drugs to inmates and
> presented his defenses thereto, which included much justification for his actions.
> (*See* Transcript of Pre-Disciplinary Hearing at Uintah County 0284-289.)

**Response:**  Disputed, because it is incomplete.  Mr. Gale spent most of the interview

addressing Sheriff Merrell's suggestion that he was involved with medical records

disappearing from the server.  Dock. no. 33-6 at Uintah County 289-299.

> 16. During the Pre-Disciplinary Hearing, Plaintiff admitted to the Sheriff that he had
> distributed the prescription ibuprofen to at least three inmates without a
> prescription and he also did so without calling the appropriate medical
> professional. *Id*. at Uintah County 0303.

**Response:**  Disputed to the extent this statement is intended to suggest that Mr. Gale

admitted he was supposed to have called an "appropriate medical professional."  Rather,

Mr. Gale made clear that he believed he was acting according to what he was told to do.

He told Mr. Isaacson that the Physician's Assistant, Logan Clark, had told him he could

give out 800 mg. Ibuprofen without calling him.  Dock. no. 33-8 at p. 85 (Uintah County

1404).  He also told Sheriff Merrell, "on the 800 milligram Ibuprofen issue, if we

wouldn't have been told to use them . . . I would've done the best that I could, and you

know, went and hopefully found some...some something.  But when we were told to use

them, I'll be the first to admit: I did.  I used them."  Dock. no. 33-6 at pp. 16-17 (Uintah

County 299-300).  He explained, "as far as I can ever remember, if we had spare

Ibuprofen 800s, we would allow the inmates to have them, and we would not document it." *Id.* at p. 18 (Uintah County 301).

17. During the Pre-Disciplinary Hearing, Sheriff Merrell confronted Plaintiff with the allegation that he gave at least one of the 800 mg. ibuprofen pills to one inmate to hand to the inmate that needed it. (*Id.* at Uintah County 0304, 306-307.) Plaintiff defended against this allegation by saying he did it that way because he had always done it that way and everyone else does it. (*Id.*)

**Response:** Undisputed. This material fact establishes the County's and the Sheriff's knowledge of the Jail's standard practice in handing out medications.

18. During the Pre-Disciplinary Hearing, Sheriff Merrell presented Plaintiff with the statements of the Jail Physician's Assistant, Logan Clark. (*Id.* at Uintah County 0301-303.) Plaintiff was presented with Clark's statement, in which Clark stated that prescription ibuprofen should not be distributed without calling him for a prescription and that another inmate's prescription ibuprofen should *never* be distributed to other inmates. (*Id.*)

**Response:** Disputed that Sheriff Merrell's "presentation" of Logan Clark's statements are accurate. Logan Clark specifically stated that staff could give inmates "over the counter Ibuprofen." Dock. no. 33-10 at p. 2 (Uintah County 190). "I could tell you to give 4 200s you don't need a prescription for that." *Id.* at Uintah County 191. He could give approval for an 800-mg tablet over the phone, and that would come from leftover blister packs from another prisoner's "overburden or excess." *Id.* He stated that officers should know not to call him about giving 800-mg of Ibuprofen, because they can just give out 4 200 mg pills without the need to call him. *Id.* at Uintah County 191-193. Mr. Clark also said that regarding Ibuprofen, "I guess there's the law and then there's the letter of the law." *Id.* at Uintah County 195. He went on to explain that "I'm not personally worried about Ibuprofen if that were out there" and that "I would prefer a

phone call.  You know sometimes there's a preference vs. you know, reality.   There's a lot of things I would prefer, but I can't get everybody to follow that." *Id.*  Mr. Isaacson asked him, [it's] "[n]ot your requirement to make everybody follow it, is it?," to which Mr. Clark replied, "No, it's not."  *Id.* at Uintah County 196.  He further explained, "Ibuprofen, or naproxen, or Tylenol, all prescribed medications which are over the counter, are handed out to inmates all the time."  He explained that he did not have "heartburn" about a staff member giving out an 800-mg tablet without calling him.  He said, "if we're just talking about 800 milligrams Ibuprofen, I mean, I would've preferred a phone call, but I would've preferred 4 200s at the same time."  *Id.*  He explained, "we have had in the past, Ibuprofen 800 milligrams in a bottle.  And if we still do.  I don't really know . . . again those are prescription.  And so someone could just take that and give it to the inmate.  So it's just . . . what we can do . . . what we are doing vs. what we can do."  *Id.* at Uintah County 196-97.  He made clear that if the allegation at issue is that someone gave an inmate an 800-mg tablet of Ibuprofen without calling him, his opinion was "that's fine."  *Id.* at Uintah County 197.

19. During the Pre-Disciplinary Hearing, Sheriff Merrell also confronted Plaintiff with the allegation that the prescription ibuprofen that he distributed belonged to another current inmate. Plaintiff responded that he did a head count earlier and could not remember that particular inmate being present, but that he did not check before handing out the inmate's medication and that he could have been a current inmate. (*Id.* at Uintah County 0302-303, 0306, 311-312; *see also* Pl. Dep. at 72:6-13.)

**Response:**  Undisputed.  Mr. Gale also explained to Sheriff Merrell that the Ibuprofen he used was what Amber Williams had put in the top drawer and told the staff to use in case

an inmate needed any while she was gone, since the facility had otherwise run out of

Ibuprofens.  Dock. no. 33-6 at 4-5 (Uintah County 287-288).

20. After the Pre-Disciplinary Hearing, on December 28, 2011, Plaintiff was
terminated for providing another inmate's prescribed medication to multiple
inmates that were not prescribed it. (Letter of Termination, Uintah County 0163,
attached hereto as Exhibit 12.) Plaintiff received the letter of termination, wherein
he was given the right to file a grievance for his termination, which he did,
through counsel. (*Id.*; Pl. Dep. at pp. 82:19-85:23.)

**Response:**  Disputed.  The letter is somewhat unclear as to the basis for termination,

stating, "Your actions in providing prescribed medication to inmates that were not

entitled to the medication violated Uintah County Jail Policy H056.00.00 Prescription

Medications.  Dock. no. 33-12.  Mr. Gale disputes that the inmates to whom he provided

the Ibuprofen were not "entitled" to receive it.

21. In Plaintiff's post-termination grievance, he objected that the Uintah County
Human Resources Director, Joe McKea, was to be involved in the post-
termination grievance review; it was alleged that McKea was not an unbiased
decision-maker. (*See* Grievance on behalf of Denile Gale dated 1/6/12, attached
hereto as Exhibit 13; *see also* Pl. Dep. at pp. 88:13-89:14.)

**Response:**  Undisputed.

22. Therefore, the County eliminated the intermediate steps of grievance review,
which required a review by McKea himself and then a review by the County
Commissioners, to which McKea was an advisor. (*See* Pl. Dep. at pp. 88:13-
89:14.) Instead, the County proceeded directly to a full evidentiary hearing before
the Career Service Review Board ("CSRB"). (*See id*; *see also* McKea
Correspondence, Exhibit 14 to Pl. Dep., attached hereto as Exhibit 14.)

**Response:**  Undisputed.

23. Plaintiff participated in a post-termination grievance hearing before the Uintah
County CSRB in which he was represented by counsel. (Pl. Dep. at pp. 89:13-
92:21.)

**Response:**  Undisputed.

24. After the hearing, the CSRB issued its findings and affirmed the termination of the plaintiff on September 10, 2012. (Pl. Dep. at 94:19-95:2; CSRB Ruling, Exhibit 16 to Pl. Dep., attached hereto as Exhibit 15.)

**Response:** Undisputed.

25. Plaintiff was represented by counsel at the hearing, who conducted discovery prior to the hearing. (*See* Defendant's Initial Disclosures at Uintah County 0337-0350, attached as Exhibit 16; *see also* Pl. Dep. at pp. 89:15-90:24.) At the hearing, Plaintiff had the opportunity to present witnesses and evidence, and was allowed to cross-examine witnesses. (Pl. Dep. at pp. 89:15-90:24; *see also* Audio Recording (partial) of CSRB Hearing, attached hereto as Exhibit 17.)

**Response:** Disputed. At the hearing before the CSRB, Mr. Gale and his counsel were

told they could call witnesses, and his counsel requested several witnesses, but the

County did not actually make the witnesses available at the hearing.  Dock. 33-5 at 89.

26. Plaintiff's counsel, Loni DeLand, did not seek a continuance of the CSRB Hearing, despite claims that he did not receive Plaintiff's personnel file and other necessary documents. (*See* Pl. Dep. at 100:7-101:21.)

**Response:** Undisputed.

27. Due to a malfunction in the recording device (the battery went dead), the first portion of the CRSB Hearing was not recorded. (*See* Pl. Dep. at 91:2-92:21; *see also* Ex. 17.) Plaintiff, through counsel continued with the remainder of the hearing despite the lack of a record. (*Id.*)

**Response:** Undisputed.

28. After receiving the CSRB determination, Plaintiff filed the present complaint. There is no evidence that Plaintiff appealed the CSRB's decision pursuant to Utah Code Ann. § 17-33-4(1).

**Response:** Undisputed.

## II.    RETALIATION IN VIOLATION OF THE FIRST AMENDMENT

### A. Legal Elements

1. Summary Judgment Standard

- When faced with a motion for summary judgment, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.

**Response:** Agreed. In addition, the court cannot decide on credibility issues. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

- The ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."

**Response:** Agreed.

- The court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.

**Response:** Agreed.

- However, the United States Supreme Court has stated that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

**Response:** Agreed.

- The nonmoving party "may not rest upon the mere allegations or denials of his pleadings" to avoid summary judgment. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

**Response:** Agreed.

- The Tenth Circuit applied this doctrine in *Thomson v. Salt Lake County*, and explained: [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"

**Response:** Agreed.

  2. <u>Section 1983 Claim for Retaliation in Violation of First Amendment</u>

- "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."

**Response:** Agreed.

- An employment retaliation case asserting a First Amendment right requires a four-step analysis of whether Plaintiff has sufficiently alleged that Defendants violated his constitutional rights. First, a court must "determine [whether] the employee's speech involved a matter of public concern." Second, a court "must 'balance the interests of the employee in making the statement against the public employer's interests in the effective and efficient fulfillment of its responsibilities to the public.'" Third, if the balance "tips in favor of the plaintiff, then he must show 'that the protected speech was a "motivating factor" in the decision.'" Finally, if the employee makes this showing, "'the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity.'"

**Response:** Agreed.

  3. <u>A Matter of Public Concern</u>

- Speech on matters of public concern has been defined as speech "fairly considered as relating to any matter of political, social, or other concern to the community." Such speech is contrasted with speech "as an employee upon matters only of personal interest."

**Response:** Agreed. The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

*Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

- This public concern inquiry requires a court to consider the content, form and context of the speech at issue, as revealed by the whole record.

**Response:** Agreed, but irrelevant. *See id.*

- "In order for a public employee's speech to be of public concern, . . . it is not always enough that its *subject matter* could in [certain] circumstances, [be] the

topic of a communication to the public that might be of general interest. What is *actually said* on the topic must itself be of public concern."

**Response:** Agreed, but irrelevant. *See id.*

4. <u>A Balancing of Interests</u>

- When the government is acting in its capacity as employer, rather than its capacity as sovereign, it enjoys a broader ability to regulate the speech and conduct of employees than it would have in regulating speech or conduct by private citizens.

**Response:** Agreed. Furthermore, "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

- In performing the requisite balancing under *Pickering*, the court must bear in mind the heightened interest of a police department in maintaining discipline and harmony among employees.

**Response:** Agreed. However, "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967).

- "The manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Considerations include "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

**Response:** Agreed.

5. <u>The Motivating Factor</u>

- A motion for judgment as a matter of law may be granted if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

**Response**: Agreed, but irrelevant for summary judgment purposes.

- Speculation or hunches amidst rumor and innuendo will not suffice to state a First Amendment retaliation claim.

**Response:** Agreed.

- "[P]rotected conduct closely followed by adverse action may justify an inference of retaliatory motive." "On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link."

**Response:** Agreed. In addition, "the phrase 'closely followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the [] complaint and only culminates later in actual discharge." *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329)10th Cir. 1996).

- The Court can decide as a matter of law if Plaintiff has established that the speech was a motivating factor in his termination.

**Response:** Disagreed. "[W]hether speech was a substantial motivating factor and whether the employer would have made the same employment decision in the absence of the speech are questions of fact for the jury." *Bass v. Richards*, 308 F.3d 1081, 1088 (10th Cir. 2002); *Baca v. Sklar*, 398 F.3d 1210, 1219 (10th Cir. 2005).

- As a matter of law, the mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive.

**Response:** Disagreed to the extent this statement omits important legal points. "An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005).

- To show that an employer's proffered nondiscriminatory reason for an employment action is pretextual, a plaintiff must produce evidence of "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"

**Response:** Disagreed with to the extent that *BCI Coca-Cola* involves Title VII claims, and *Morgan* involves ADA and FMLA claims, not First Amendment claims. *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (10th Cir. 2006); *Morgan v. Hilti, Inc.*, 108 F.3d 1319 (10th Cir. 1997).

6. <u>Political Affiliation</u>

- In cases of retaliation or discrimination based on political affiliation, courts apply the test developed in *Elrod v. Burns*, and *Branti v. Finkel*.

**Response:** Agreed.

- The *Elrod/Branti* framework provides a two-part inquiry. "To survive summary judgment, an employee needs to show a genuine dispute of fact that (1) political affiliation and/or beliefs were 'substantial' or 'motivating' factors in his demotion, and (2) his position did not require political allegiance."

**Response:** Agreed. A casual connection of an employer's "motivation" behind an adverse employment action may be shown through pretext. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012); *Proctor v. United Parcel Service*, 502 F.3d 1200, 1209 (10th Cir. 2007).

- Once a plaintiff proves that his political affiliation was a substantial or motivating factor behind his termination, the burden of persuasion shifts to the defendants to prove, as an affirmative defense, that the discharge would have occurred regardless of any discriminatory political motivation.

**Response:** Agreed.

- A plaintiff may, however, negate the defendants' proffered reasoning for the termination by providing evidence that the defendants' nondiscriminatory reason is pretextual.

**Response:** Agreed. "The plaintiff need not present direct evidence of illegal discriminatory animus to survive summary judgment." *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir. 1999). Pretext is established if the plaintiff shows an employer's "proffered explanation is unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995). "So long as the plaintiff has presented evidence of pretext . . . upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury." *Id.* at 453.

### B. Material Facts

1. Plaintiff asserts that he was terminated in retaliation for campaigning for another candidate for Sheriff. (Complaint at ¶ 27.)

**Response:**  Undisputed.

2. Plaintiff claims he campaigned for Sheriff Merrell's opponent during Merrell's second term election. (*See* Pl. Dep. 98:6-99:24.) Sheriff Merrell's second term began in 2010. (*See id.; see also* Merrell Dep. at P. 63:9-18, attached hereto as Exhibit 18.)

**Response:**  Undisputed.

3. Plaintiff asserts that "[a]s part of his campaigning, [he] purchased and placed banners, met with voters, and verbally campaigned for Rick Reynolds. [He] was very open outside the workplace about the fact that he was campaigning for Mr. Reynolds." (*See* Pl. Answ. to Interrog. at No. 14, attached hereto as Exhibit 19.) Other than these bare allegations, Plaintiff has provided no evidence as to his involvement with the Reynolds campaign for Sheriff in 2010.

**Response:**  Disputed.  *See* Declaration from Lamar Davis, attached as Exhibit C, who testified that he was aware that Mr. Gale campaigned for Rick Reynolds, and it was common knowledge in their community ( ¶¶ 3, 13, 14; *see also* Response to Fact 5, below.

4. Plaintiff has not provided any evidence that Mr. Reynolds even ran for Uintah County Sheriff in 2010.

**Response:**  Disputed.  *See* Exhibit C, ¶ 3.

5. Sheriff Merrell testified that he has no idea whether Plaintiff campaigned for him or his opponent when he ran for Sheriff. (Merrell Dep. at 63:9-18.)

**Response:**  It is undisputed that Sheriff Merrell testified to this, but Mr. Gale disputes that Sheriff Merrell's statement is true, as Mr. Gale informed Sheriff Merrell during one of his grievances that he believed he was being retaliated against "after the elections of 2010 and knowing of my political activities and affiliations towards the office of the Sheriff of Uintah County in violation of state and federal laws."  Exhibit D at 2.

## III.   LOREN ANDERSON'S IMMUNITY

### A. Legal Elements

1. <u>Absolute Immunity</u>

- It is "well established that absolute prosecutorial immunity extends to state attorneys and agency officials who perform functions analogous to those of a prosecutor in initiating and pursuing civil and administrative enforcement proceedings."

**Response:** Agreed.

- Absolute prosecutorial immunity is necessary because "the loser in one forum will frequently seek another," and because unfounded, harassing lawsuits divert government attorneys from their public duties and risk coloring their decisions and advocacy.

**Response:** Agreed, but irrelevant.

- In *Atiya v. Salt Lake County*, the Tenth Circuit concluded that the role of a County Career Service Review Board was "functionally comparable" to that of a judge and that the individual Council members were protected by absolute immunity.

**Response:** Agreed that if a Career Services Council acts within U.C.A. § 17-33-4, it may be protected under a "quasi-judicial immunity" theory in future litigation. The potential immunity of Uintah County's Career Services Board is irrelevant to this case, though, because none of the Board's members are Defendants in this litigation.

- The Tenth Circuit has further concluded that individual government attorneys' prosecutorial functions in connection with proceedings that are functionally comparable to that of a court of law are absolutely immune from section 1983 liability.

**Response:** Agreed.

- To determine which activities are granted absolute prosecutorial immunity, the Supreme Court has applied a functional approach. Activities that are "integral" to the proper functioning of the judicial system are protected by absolute immunity. Conversely, the more removed an official's function is from the judicial process, the less likely it is that he or she will be entitled to absolute immunity.

**Response:** Agreed.

- An attorney's statements in court unquestionably fall within the scope of absolute immunity. The Court further noted that the safeguards built into the judicial system such as cross-examination, rules of evidence, and the opportunity to present one's own evidence, reduce the need for private damages actions as a means of controlling unconstitutional conduct.

**Response:** Agreed.

- Absolute immunity applies even when officials *knowingly* provide false information to the court or purposefully omit material information.

**Response:** Disagreed. The Supreme Court has analyzed prosecutorial immunity on a case-by-case basis. *See Mink v. Suthers*, 482 F.3d 1244, 1259-61 (10th Cir. 2007) (collecting cases). Absolute immunity may apply for knowingly providing false information to the court, or purposefully omitting material information, depending on the prosecutor's function at the time. *Id.*

- But absolute immunity is not limited to an attorney's conduct in court. The Supreme Court recognized in *Imbler* that "the duties of a prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom."

**Response:** Disagreed. "To qualify for absolute immunity, [] an action must be 'closely associated with the judicial process.'" *Mink*, 482 F.3d at 1261 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 495 (1976).

- The Court also rejected the argument that absolute immunity was limited to in-court conduct in *Buckley v. Fitzsimmons*. Although the Court ultimately denied immunity in that case, it explained that the "acts undertaken by an attorney in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity."

**Response:** Disagreed. In *Buckley*, the Supreme Court found that a prosecutor's pretrial investigation was not entitled to absolute immunity; therefore, an attorney's out-of-court conduct is not guaranteed absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 & n.5 (1993). The Supreme Court has since explained that the key to absolute immunity is "whether the task 'involved the exercise of professional judgment,' not merely the review of the 'truth or falsity of the factual statements themselves.'" *Mink*, 482 F.3d at 1261 (quoting *Kalina v. Fletcher*, 522 U.S. 118, 130 (1997)).

- The Tenth Circuit has also held that investigative or administrative activities may be protected by absolute immunity when they are necessary for an attorney to fulfill his or her function as an officer of the court.

**Response:** Disagreed. The Tenth Circuit applies a "continuum based approach," and the "more distant a function is from the judicial process, the less likely absolute immunity will attach." *Roberts v. Kling,* 104 F.3d 316, 318-19 (10th Cir. 1997). "The 'determinative factor' is 'advocacy' because that is the prosecutor's main function and the one most akin to his quasi-judicial role." *Mink*, 482 F.3d at 1261 (quoting *Roberts*, 104 F.3d at 319). "Absolute immunity, however, does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution." *Id.* at 1262.

    2.  Qualified Immunity
- Summary judgment decisions involving a qualified immunity defense are subject to an analysis that is different from that employed in other summary judgment rulings. "Qualified immunity is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial."

**Response:** Agreed.

- After a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff. The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. If a favorable view of the facts alleged shows the violation of a constitutional right, the next sequential step is to ask whether the right was clearly established at the time of the defendant's unlawful conduct. When the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.

**Response:** Agreed. If the plaintiff succeeds in carrying this burden, the burden shifts to the defendant to show "there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995).

- 42 U.S.C. § 1983 specifically requires an element of causation.

**Response:** Agreed.

### B. Material Facts

1. Sheriff's Policy 2-600.09, instructs that the Uintah County Attorney's Office is consulted for legal assistance in administration of the Sheriff's Policy. (*See* Sheriff Policy at P. 20; *see also* Merrell Dep. at P. 38:8-10.)

**Response:** Disputed, as Defendants did not attach the policy to which they cite.

2. After Plaintiff's termination, he was represented by an attorney. (*See* Pl. Dep. at pp. 90:15, 92:16, 95:7.) The County was represented before the CSRB by counsel drawn from the Uintah County Attorney's Office. (*See* CSRB Ruling, Ex. 15 hereto, *see also* Ex. 17 hereto.) This representation involved counsel for the County interacting with Plaintiff's counsel for the discovery and exchange of documents leading up to the CSRB hearing. (*See* Pl. Dep. at 99:25-100:15.)

**Response:** Undisputed.

## STATEMENT OF ADDITIONAL ELEMENTS

## I.   WAIVER OF A PROCEDURAL DUE PROCESS CLAIM

1.   The Supreme Court has held, "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990). In its explanation, the Supreme Court stated:

> This general rule applies in a straightforward way to two of the three kinds of § 1983 claims that may be brought against the State under the Due Process Clause of the Fourteenth Amendment. First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e.g.,* freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S., at 331, 106 S.Ct., at 664. As to these two types of claims, the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. *Id.,* at 338 (STEVENS, J., concurring in judgments). A plaintiff, under *Monroe v. Pape,* may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights.

*Id.*

## II.   PROCEDURAL DUE PROCESS

1.   The Tenth Circuit follows the *Matthews* three-part test to determine the type and amount of procedure required by the Due Process Clause. *Benavidez v. City of Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996). Specifically:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

xlvi

2. "As to the first *Mathews* factor, the Supreme Court has recognized the significant private interest in retaining employment and 'the severity of depriving a person of the means of livelihood,' explaining that '[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543 (1985).

3. "The second *Mathews* factor weighs the risk of an erroneous deprivation and the value of additional procedures." *Benavidez*, 101 F.3d at 626. "*Loudermill* recognized that dismissals for cause will often involve factual disputes, and that even when the facts are clear, the appropriateness or necessity of the discharge may not be." *Id.*; *see also Loudermill,* 470 U.S. at 543.

4. Municipal liability for § 1983 violations arises when a municipal policy or custom caused the violation of Mr. Gale's protected rights. *David v. City & County of Denver*, 101 F.3d 1344, 1357 (10th Cir. 1996). A municipal policy may include not only policy statements, ordinances, and regulations, but also the individual decisions of city officials who have "final policymaking authority." *Id.*

### STATEMENT OF ADDITIONAL MATERIAL FACTS

The following facts are not included in Defendants' fact section, but are important to the issues to be decided in this case:

1.   Mr. Gale has been giving out medication to inmates as part of his job since 1991, and the practice regarding pain relievers was that the officers could "hand [them] out basically as we felt the need was there."  Dock. no. 33-5 at 12-13.

2.   There was a practice at the jail of retaining medications such as Ibuprofen 800 and Tylenol "as an on-stock [medication] in case we needed to use them." Dock. no. 33-5 at 25-26.  The PAs and the jail doctor directed that these medications in prescription strength be kept "on-stock" to "be distributed as needed, and they gave a lot of that discretion" to Mr. Gale.  *Id.* at 26.

3.   When inmates did not use their entire prescription and had leftovers, the staff would turn it into an "on-hand or an overstock" medication that was not thrown away. Dock. no. 33-5 at 112.  They kept medications that were used frequently, such as Ibuprofen. *Id.* at 113-114.

4.   Mr. Gale testified that the "on-stock" medication usually did not have an inmate's name on it (sometimes because the officers removed it from an old prescription), but through years of working at the jail, including after July 22, 2010, he understood the practice was that officers could give out the on-stock medications to inmates who did not

have a prescription for it.  Dock. no. 33-5 at 30-31.  This was a "practiced policy" that
Mr. Gale and others had been doing for 17 years.  *Id.* at 66-69.

5.   The staff at the jail understood and discussed there being "gray area" in the policy,
which allowed them to handle situations differently than the written policy required,
which included giving out "on-stock" medications to inmates who did not have
prescriptions for those medications.  *Id.* at 34-35.  Mr. Gale testified that there was no
requirement for having inmates sign to receive on-stock medications.  *Id.* at 40, 62:15-17.

6.   In fact, there is no policy regarding or recognizing "on-stock" medication at all,
and yet the staff has access to them to provide to inmates.  *Id.* at 41.

7.   Just prior to the incident for which Mr. Gale was terminated, the medical officer,
Amber Williams, had informed Mr. Gale and others that the jail was out of Ibuprofen,
and she was going to be out, so she was leaving some 800-mg Ibuprofens in the top
drawer of the medical cabinet for the officers to give to inmates who needed it. Dock. no.
33-5 at 32-33, 60-61.  There were no non-prescription strength Ibuprofens elsewhere in
the cart for indigent inmates.  *Id.* at 58-59.  Mr. Gale's coworker, Stephanie Jones, was
also present and heard Ms. Williams state the same.  Dock. no. 33-20 at 28:9-29:19.

8.   At the time of the incident that led to Mr. Gale's termination, Ms. Williams was
the officer who determined what medications were kept and which were destroyed.
Dock. no. 33-5 at 114:6-10.  In other words, if medications in the medical cart should not
have been used, it was her responsibility to destroy them.

9.  In August 2010, Sheriff Merrell had made Ms. Williams the medical officer over the jail, replacing Mr. Gale in that role.  Merrell Depo., dock. no. 33-18, at 10:10-11:7.

10. Although there is no policy that speaks to the use of "on-stock" medications, there is a policy that states that staff members "need to make an attempt to alleviate any inmate's pain or suffering."  Dock. no. 33-5 at 55.

11. On a single day in October 2011, Mr. Gale provided 800-mg Ibuprofen tablets to three inmates (that he remembers) who were complaining of various painful ailments. In providing on-stock Ibuprofen to an inmate who had a broken molar, Mr. Gale believed he was following the policy of alleviating any inmate's pain or suffering as best he could. *Id.* at 54-57.

12. He retrieved Ibuprofen from a drawer that was not one in which the inmates' personal prescriptions were kept, which was precisely where Ms. Williams told him that she was leaving packets of Ibuprofen for the staff to use for inmates if they needed it.  *Id.* at 110-111.  This is the incident for which Mr. Gale was terminated.

13. Leonard Isaacson conducted an investigation into Mr. Gale's conduct in providing Ibuprofen to inmates.  Mr. Gale explained to Mr. Isaacson that he gave inmates Ibuprofens from the top shelf of the medicine cart, which he understood to be property of the jail.  Dock. no. 33-10 at 25 (Uintah County 1402).  He said, "This is not an uncommon thing; we've done it actually for several decades."  *Id.*  He explained that Ms. Williams had said that the jail had run out of commissary Ibuprofen, so she had told the staff "that she was going to leave some in the top drawer of that cart that we could use if

1

we needed to." *Id.* at Uintah County 1403.  He noted that the Ibuprofen he gave out had an inmate's name on it, but that was not unusual, as the physician's assistants who prescribed medications had told him that medication from an inmate could be used as long as needed in the facility after the inmate was gone.  *Id.*  Mr. Gale explained that Mr. Clark had told him that he could hand out Ibuprofen 800s, as that medication was not something they were "overly worried or overly concerned about." *Id.*  Mr. Gale explained that inmates did not have to sign for 800 mg Ibuprofen when it was "property of the jail" like those that Ms. Williams left in the drawer, as opposed to an inmate's prescription.  *Id.* at 30 (Uintah County 1407).

14. Amber Williams told Mr. Isaacson that approximately three or four weeks prior to his interview of her, the jail started using a new medical cart that contained drawers to hold medication, and there had been no training about how to use the cart prior to Isaacson's investigation of Mr. Gale.  *See* Isaacson's interview with Williams, at 3 (Uintah County 280), attached as Exhibit F.

15.  Mr. Isaacson also interviewed two Physician's Assistants and several inmates as part of his investigation.  One of the PA's, Logan Clark, specifically stated that staff could give inmates "over the counter Ibuprofen."  Dock. no. 33-10 at 2 (Uintah County 190).  "I could tell you to give 4 200s you don't need a prescription for that." *Id.* at 3 (Uintah County 191); *see also* Response to Defendants' Fact 18.  Mr. Clark ultimately stated that if the allegation at issue is that someone gave an inmate an 800-mg tablet of Ibuprofen without calling him, his opinion was "that's fine." *Id.* at 9 (Uintah County 197).

li

16.  Inmate Casey Bryant told Mr. Isaacson that some staff do not watch inmates take their medications, such as sleeping pills and muscle relaxants, so inmates trade the pills for phone time.  Dock. 33-10 at 16-17 (Uintah County 214-14).

17.  Inmate Cynthia Lucero told Mr. Isaacson she had last asked for an Ibuprofen the day before, from [Amber] Williams.  Exhibit G at 3 (Uintah County 235).

18.  Inmate Scott Peterson stated that it depends on the officer, but they only watch inmates take their medication about 80% of the time.  Dock. 33-8 at 74 (Uintah County 248).  He informed Mr. Isaacson about his refills disappearing; and an instance in which Amber Williams brought another inmate who was supposed to have a refill available on his Ibuprofen prescription "a yellow pill and said it was just like Ibuprofen," and crossed another name off the prescription form and wrote his name on it; and that he had once received an Ibuprofen that had a different inmate's name on it.  *Id.* at Uintah County 249.  Mr. Peterson also told Mr. Isaacson that he was aware that another inmate has an Ibuprofen prescription that is not his, and identified Williams as giving that inmate someone else's prescription.  *Id.*  Mr. Peterson commented, "But all the good drugs, you have to sign for them."  *Id.* at Uintah County 250.  Mr. Peterson indicated that Ms. Williams had provided him with Ibuprofen out of "the drawer" without a prescription. *Id.* at Uintah County 251.

19.  Mr. Isaacson ignored the aforementioned statements made to him that pointed to widespread problems at the jail regarding how prescriptions were handed out by the staff generally because he was only told to investigate "those five pills that were handed out . .

. .'' Dock. no. 33-8 at 24:16-26:6.  Likewise, he did not follow up on an inmate's statement that Amber Williams had provided her with Ibuprofen.  *Id.* at 36:9-37:8.  Nor did he follow up on inmate Peterson's claim that Amber Williams had given an inmate the wrong prescription and tried to give him a yellow pill that she claimed "was just like Ibuprofen."  *Id.* at 40:7-45:10.

20.  Sheriff Merrell testified that he read the interview of Mr. Peterson as part of his decision to terminate Mr. Gale.  Dock. no. 33-18 at 55:23-25.  He explained his lack of concern about Ms. Williams' conduct such as Ms. Williams providing an inmate a yellow pill that she claimed was "just like Ibuprofen" as follows: "Again, I – the context of this investigation was not octopussing (sic) and tentacles of how many investigations we could start from this investigation.  This investigation was focused on five pills missing from a particular blister pack and how it all become.  I'm trying to remember.  There was other things.  Again, should we open a second investigation.  Maybe we should have done at that point.  But if you, if you read the inmate's, am I going to be in trouble?  Am I going to dah, dah, dah, dah, dah.  This is an investigation on five pills."  *Id.* at 62:5-21.

21. Merrell is not aware of Ms. Williams ever being disciplined.  *Id.* at 33:18-23.  In fact, Merrell is not aware of any other jail employee being disciplined for the way they provided prescription medications to inmates. *Id.* at 37:18-21.

22. Merrell testified that he did not believe Mr. Gale when he stated that other jail employees were also handing out prescription medications to the inmates, but he did not ask the other employees.  *Id.* at 53:16-54:5.

23.  However, Merrell's understanding is that "[i]f an inmate has a headache and just wants some Tylenol or Ibuprofen to deal with it, [] a jailer or medical officer [can] just give them some and that would be the end of it." *Id.* at 30:9-13.

24.  Merrell is also aware that certain inmates are allowed to have Ibuprofen in their cell.  *Id.* at 58:10-12.

25.  In the Notice of Pre-Disciplinary Hearing, Merrell claimed that he was reviewing allegations that were "a result of activity that involved a prescribed drug (Ibuprofen 800) being handed out by you in the performance of your duties as a Correctional Officer on or about 10/02/11, to inmates that were not entitled to the prescribed medication.  Dock. no. 33-11.  In his Pre-termination Hearing, however, Sheriff Merrell claimed that the allegations against Mr. Gale were that he was "dispensing – giving out – prescription medications which is regulated by law um, and not logging those medications or having those medications signed for.  Um.. I halso have questions about medical records on our computer."  Dock. no. 33-6 at 4 (Uintah County 287).

26.  In his interview with Sheriff Merrell, Mr. Gale explained that he had never been required to call a doctor in the past to give someone an 800-mg Ibuprofen.  Dock. no. 33-6 at 26 (Uintah County 309).  He stated, "If I need to change [his practice], just say, 'Yo, Denile, change it.'" *Id.*

27.  Another corrections officer, Stephanie Jones, testified that "probably every single one of us has handed out an Ibuprofen 800 or the Tylenol that was blistered pack because that is how we were told to do it . . . . I mean, the five years that I was there, that is how

we did it. Dock. no. 33-20 at 29:23-30:3.  Ms. Jones testified that if Mr. Gale was fired for giving out Ibuprofen 800, "then I think we all probably should have been fired." *Id.* at 34:8-16.  (Mr. Isaacson did not interview Ms. Jones as part of his investigation, but did accuse her of interfering with it and threatened her with criminal prosecution if she discussed it.  Dock. no. 33-20 at 32:4-33:5.)

28.  Further, the former jail commander, Lamar Davis, testified, "[t]he practice of providing prescription strength Ibuprofen to the inmates is something that had been done for many years and there had been no formal training on the new procedure."  Ex. C, ¶ 11.

29. Sheriff Merrell maintains that the policies and procedures of the County are applied equally to all county employees.  Dock. no. 33-18 at 20:15-22:5.

30.  Lamar Davis, however, testified that Sheriff Merrell's administration has not pursued discipline against employees who were known or suspected of engaging in activities significantly more egregious than giving out Ibuprofen.  Ex. C.  For instance, the Sheriff would not pursue allegations that: Amber Williams lied during an investigation; two officers were having an affair while one was still married, which is against the policies of POST and the Sheriff's Office; a female officer was sending nude photographs of herself to a mail officer; or that an officer (Leonard Isaacson) left his gun on a counter unattended at a party where children were present.  Ex. C at ¶¶ 7, 8.

31.  Uintah County Policies include a Progressive Discipline policy, which states, "In most cases, an employee will be given an opportunity to correct the behavior for which

s/he is being disciplined.  If an employee's conduct is severe, pervasive, or blatant, Department Heads may bypass any step of the disciplinary process if they feel that the behavior warrants such."  Dock. no. 33-18 at 33 (Uintah County 533).  The Policy sets forth a progressive disciplinary process that "shall be used unless the Department Head or Supervisor determines that conduct warrants a more severe disciplinary action," which starts with a "Documented verbal reprimand," then proceeds to a "Written reprimand," then sets forth "Disciplinary Consequences" including demotion, suspension, probation or termination."  *Id.* at 33-34 (Uintah County 533-34).  Termination is only appropriate "[i]f an employees' improper conduct is repetitive, severe, or appears irreparable, the employee shall lose all rights to perform work on behalf of Uintah County."  *Id.* at 34 (Uintah County 534).

32.  Lamar Davis did not believe that Mr. Gale should have been terminated based on his conduct, and that he felt pressured to go along with it because he believed he would be harassed if he did not.  Ex. C at ¶ 12.

33.  After the Sheriff's re-election campaign in 2010, Mr. Gale testified that "the head hunting started," and "it seems like at that point, [he] had become labeled, so to speak, and was one of the head huntees."  Dock. no. 33-5 at 98.  Mr. Gale explained that the administration became "hypercritical towards the members . . . that had campaigned against Sheriff Merrell."  *Id.* at 98-99.  He believes that retaliation for his campaign activities is demonstrated by the fact that policy dictates that "termination will be a last

resort, and I went from no disciplinary history or very – almost nonexistent disciplinary history to termination in one instant." *Id.* at 105.

34.  In a grievance letter to Sheriff Merrell dated February 21, 2011, Mr. Gale stated, "Some of Chief Deputy Laursen's actions also seem to have become elevated or show an increase in aggression after the elections of 2010 and knowing of my political activities and affiliations towards the office of the Sheriff of Uintah County in violation of state and federal laws."  Exhibit D.

35.  In response to Mr. Gale's February 2011 grievance, in which Mr. Gale suggested he was being retaliated against because of his political activities during the 2010 election campaign, Sheriff Merrell stated that the actions about which Mr. Gale complained were "in no way connected to the 2010 election as you have alleged."  Exhibit E at 2.  Further, Sheriff Merrell stated in his response, "I feel as though you are causing tension and disharmony in the department by suggesting certain disciplinary actions for your co-workers." *Id.*  Finally, Merrell denied Mr. Gale's grievance in its entirety. *Id.*

36.  Lamar Davis, who was one of the decision-makers in Mr. Gale's termination (but was not in favor of termination) stated that everyone was aware of Mr. Gale's support of Sheriff Merrell's challenger in the 2010 election and believed that Mr. Gale's activities were one of the reasons he was targeted for termination.  Ex. C at ¶¶ 3, 14.  He also stated that another deputy who had supported Sheriff Merrell's challenger was also terminated, prior to Mr. Gale. *Id.* at ¶ 13.

37.   At the start of the CSRB Hearing regarding Mr. Gale's termination, Mr. Gale's attorney stated, "I would like to be able to provide you with Mr. Gale's personnel file so you could see for yourself the evaluations he had . . ." and pointed out that he had made the request to the County's attorney, Loren Anderson, in a letter dated 4/26.  At that point, the recording ends.  Dock. no. 33-17(1) at 16:07-26.

38.   After the parties discovered that the recording device was not working for the first part of the hearing, Mr. Gale and his counsel stipulated that the hearing could go forward, but only based on a stipulation that the facts and findings of the Career Service Board would make specific reference to the unrecorded portion of the hearing; the CSRB did not ultimately refer to the unrecorded portion of the hearing. *Id.* at 90-91, 95; *see* CSRB decision at dock. no. 33-15.

39.   Since Mr. Gale filed this lawsuit, at least one other Uintah County employee has filed a due process claim, and has requested that Joe McKea remove himself from the appeal process due to potential bias.  Exhibit H at 4, 5.

## ARGUMENT

### I.  PROCEDURAL DUE PROCESS

#### A.  Mr. Gale did not waive his procedural due process claim.

Because Mr. Gale appropriately grieved his termination and 42 U.S.C. § 1983 claims do not require exhaustion of administrative remedies, Mr. Gale did not waive his procedural due process claim. Defendants maintain that Mr. Gale cannot pursue a 42 U.S.C. § 1983 claim in federal court because Mr. Gale did not opt to appeal Uintah County's Career Service Review Board's ("CSRB") decision to state district court, as allowed by Utah Code Ann. § 17-33-4. *See* dock. no. 33 at 30-31. The statute the Defendants refer to is a noncompulsory statute; there is no mandate that public employees must follow such statute before bringing a procedural due process claim in federal court.

"'Courts indulge every presumption against the waiver of fundamental constitutional rights.'" *Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas*, 869 F.2d 555, 557 (10th Cir. 1989) (quoting *United States v. Williamson*, 806 F.2d 216, 219 (10th Cir. 1986)). The Supreme Court has made clear that plaintiffs do not need to exhaust noncompulsory administrative remedies before filing a §1983 claim in federal court. *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627-28 n. 2 (1986). The Tenth Circuit has followed the Supreme Court precedent. *Brown v. Day*, 555 F.3d 882 (10th Cir. 2009). Furthermore, the Supreme Court has held, "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990).

1

Defendants also misunderstand Mr. Gale's procedural due process claim. Mr. Gale is not appealing the CSRB's decision to federal court; Mr. Gale is alleging that the procedural process in place for public employees in Uintah County is deficient.  This is dissimilar to *Lee v. Regents Of Univ. of Cal.*, 221 Fed. Appx. 711 (10th Cir. 2007), on which Defendants rely. *Lee* involved a 12(b)(6) motion for failure to state a 42 U.S.C. § 1983 claim because in a state employee's complaint, the employee's only allegation was that the defendants "deprived [him] of rights protected by § 1983, specifically, the right to be suspended or terminated only for just cause." *Id.* at 712. This allegation failed to state a procedural due process claim. *Id.* at 712-13. Here, Mr. Gale appropriately grieved his termination by appealing the decision.  Dock. no. 33-13. Joe McKea, Uintah County's Human Resources Director, unilaterally decided to forego the appeal process, and Mr. Gale's appeal was heard before the CSRB.  Dock. nos. 33-14, 33-15.  Mr. Gale objected to this decision and included this action as part of his allegations in his complaint to this Court. *See* dock. no. 2 at 3. It is unclear what Defendants are referring to in their statement that "[Mr. Gale] waived the opportunity to challenge the fairness of the available post-deprivation proceeding because he did not fully request such a proceeding." Dock. no. 33 at 31. Defendants do not cite to any facts to indicate which "proceeding" they are discussing; regardless, Mr. Gale requested every level of review available to Uintah County employees, but he was denied the opportunity by Mr. McKea. Dock. no. 33-14.

Because Mr. Gale grieved his termination, but the termination procedures were deficient, and "overlapping state remedies are generally irrelevant to the question of the

existence of a cause of action under § 1983," Mr. Gale has not waived his procedural due

process claim. *Zinermon*, 494 U.S. at 124.

**B. Mr. Gale has a property interest in his position with the Uintah County Sheriff's Office.**

Because Mr. Gale has a property interest in his position with Uintah County, he is

entitled to procedural due process. "[W]hen a person's employment can be terminated

only for specified reasons, his or her expectation of continued employment is sufficient to

invoke the protections of the Fourteenth Amendment." *West v. Grand County*, 967 F.2d

362, 366 (10th Cir. 1992); *see also Kingsford v. Salt Lake City School Dist.*, 247 F.3d

1123, 1129 (10th Cir. 2001) (explaining that when "there are substantive restrictions on

the ability of the employer to terminate the employee," a continued expectation of

employment is established).

Mr. Gale, as a 16-year deputy in the Uintah County Sheriff's Office, was a merit

systems officer who could only be terminated "for cause." U.C.A. § 17-30-18.

Specifically, Mr. Gale could only be terminated for 1) neglect of duty; 2) disobedience of

a reasonable order; 3) misconduct; 4) inefficiency or inability to satisfactorily perform

duties; or 5) an act inimical to the public service. *Id.*   Accordingly, Mr. Gale has property

right in his job as a career service employee. U.C.A. § 17-30-18.

**C. Mr. Gale was not afforded procedural due process because the process in place is deficient.**

The Tenth Circuit follows the *Matthews* three-part test to determine the type and

amount of procedure required by the Due Process Clause. *Benavidez v. City of

Albuquerque*, 101 F.3d 620, 626 (10th Cir. 1996). Specifically:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)). "As to the first *Mathews* factor, the Supreme Court [has] recognized the significant private interest in retaining employment and 'the severity of depriving a person of the means of livelihood,' explaining that '[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.'" *Id.* (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543 (1985)). "The second *Mathews* factor weighs the risk of an erroneous deprivation and the value of additional procedures." *Benavidez*, 101 F.3d at 626. "*Loudermill* recognized that dismissals for cause will often involve factual disputes, and that even when the facts are clear, the appropriateness or necessity of the discharge may not be." *Id.*; *see also Loudermill,* 470 U.S. at 543.

"[E]mployees with a property interest [] have a right to an unbiased pre-termination decision-maker." *Bjorklund v. Miller*, 467 Fed. Appx. 758, 765-66 (10th Cir. 2012). "[A] personal stake in the outcome of proceedings can create a conflict of interest sufficient to deprive an employee of an unbiased decision-maker." *Id.* at 766 (citing *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 520 (10th Cir. 1998)). "One recognized form of personal stake is an attempt to seek self-vindication, a possibility long recognized in the vindictive prosecution context." *Id.* In *Bjorklund*, the Tenth Circuit

4

correctly reasoned that the decisionmaker in an employee's termination could have had a personal stake in the outcome of the employee's termination because the employee had previously accused the decisionmaker of illegal conduct. *Id.* at 767. "In particular, by moving that his employment be terminated . . . [the decisionmaker] may have actively denied [the employee] his due process right to an impartial decision-maker." *Id.*

Defendants spend most of their argument disputing that Mr. Gale was afforded proper pre-termination notice and procedure. *See* dock. no. 33 at 32-34. Defendants ignore, however, that Mr. Gale's pre-termination interview was conducted by Sheriff Merrell, a biased decisionmaker.  For instance, in response to Mr. Gale's February 2011 grievance accusing his administration of retaliating against him for his political activies, Sheriff Merrell denied the accusation but stated that Mr. Gale was "causing tension and disharmony in the department."  AMF 35.  Even one of the decision-makers in Mr. Gale's termination believed Mr. Gale was being targeted in part because of his political activities.  AMF 36.  Because Sheriff Merrell was retaliating against Mr. Gale for campaigning against him in the Uintah County Sheriff's election, Sheriff Merrell "actively denied" Mr. Gale his "due process right to an impartial decision-maker." *See Bjorklund*, 467 Fed. Appx. at 765-67.

After Sheriff Merrell decided to terminate Mr. Gale, Mr. Gale requested an appeal. Mr. Gale's attorney at the time noted that the County's policies regarding appealing a termination were deficient because the levels of review did not afford employees unbiased decisionmakers.  Dock. no. 33-13.  In response to Mr. Gale's counsel, Mr. McKea unilaterally forfeited Mr. Gale's right to two levels of County review, leaving Mr.

Gale with only one review of Sheriff Merrell's decision. Dock. no. 33-14.  Uintah County's policies in and of themselves do not provide for complete due process because there is no option for employees to have unbiased decisionmakers.

For example, since Mr. Gale initiated this lawsuit, at least one other Uintah County employee has filed a lawsuit against the County, alleging in part due process violations. AMF 39.  The employee-plaintiff had to request that Mr. McKea remove himself from the grievance process because of potential or actual bias.  *Id.* Because employees must request that at least one level of appeal be changed due to bias, the process in place violates County employees', including Mr. Gale's, due process rights.

In addition, Defendants maintain that because Mr. Gale was interviewed by Detective Leonard Isaacson as part of Detective Isaacson's internal affairs investigation, he was afforded proper pre-termination procedure. *See* dock. no. 33 at 32-33. Detective Isaacson's internal affairs interview had nothing to do with Mr. Gale's right to pre-termination notice of the charges against him, however, which is evidenced by the fact that Detective Isaacson did not know what a *Loudermill* hearing was. *See* dock. no. 33-8 at 90-91. Because Uintah County's procedural policies are deficient and do not afford employees (like Mr. Gale) an opportunity to be heard before unbiased decisionmakers, Mr. Gale was not afforded procedural due process.

### D. Defendants' additional reasons for Mr. Gale's termination violate his procedural due process rights and should be ignored.

Procedural due process, at its most basic level, requires that an employee with a property right in his or her job to have 1) notice and 2) an opportunity to be heard when

6

faced with the deprivation of that property right, such as a termination. *Loudermill*, 470 U.S. at 542. In Defendants' Motion for Summary Judgment, Defendants argue that "Plaintiff has produced no evidence indicating that other officers distributed another inmate's prescription drugs to inmates without a prescription . . . . This was a separate and equally egregious reason for Plaintiff's termination." Dock. no. 33 at 35. Mr. Gale disputes that there is no evidence regarding this allegation; regardless, Mr. Gale was never given notice that this basis was a separate reason for his termination.

Under Utah law, proper notice is "usually in the form of a termination letter or similar memorandum." *Becker v. Sunset City*, 309 P.3d 223 ¶ 15 (Utah 2013); *Fierro v. Park City Mun. Corp.*, 2012 UT App 304, ¶¶ 17-19 & n.4, 295 P.3d 696. In *Becker*, a city police officer received a termination letter, notifying him that he was being terminated for showing up to work with a blood alcohol content of .045, in violation of the city's policy. *Becker*, 309 P.3d at ¶ 16. At the police officer's appeal hearing, the city gave an additional reason for the officer's termination. *Id.* The Utah Supreme Court held that because the police officer was not given prior notice of the additional reason for termination, which could have been done in his termination notice, the additional reason could not be considered as a basis for termination. *Id.* The *Fierro* court explained how it is "difficult" for a terminated employee to appeal the termination "in the absence of a notice of termination or other document listing the specific reasons for termination." *Fierro*, 2012 UT App at ¶ 17 n.4.

In this case, Defendants provided Mr. Gale with a notice of pre-disciplinary hearing.  Dock. no. 33-11. The notice lists four policies that Mr. Gale potentially violated.

*Id.* The policies listed merely define what each policy means; they do not explain when or how Mr. Gale violated each policy. *Id.* The only explanation given is that "[t]hese allegations are a result of activity that involved a prescribed drug (Ibuprofen 800) being handed out by you in the performance of your duties as a Correctional Officer on or about 10/02/11, to inmates that were not entitled to the prescribed medication." *Id.* The termination letter says only that Mr. Gale was being terminated "for cause" for violating "Utah State Law in providing a prescribed medication to inmates." Dock. no. 33-12. Nowhere in these letters is there notice that Mr. Gale was being terminated for providing "another inmate's prescription drugs to inmates without a prescription." *See* dock. no. 33 at 35. Neither is there notice that Mr. Gale was being terminated for "handing [Ibuprofen] to one inmate to give to another," which is yet another reason given for his termination in this litigation. *Id.* at 36.

Mr. Gale's counsel at the time objected to the lack of notice Defendants provided Mr. Gale. Dock. no. 33-13. In response, Mr. McKea directed Mr. Gale's counsel back to the notice of pre-disciplinary hearing, which does not explain when or how Mr. Gale violated the listed policies, and stated simply that "Mr. Gale was terminated for his conduct." Dock. no. 33-14 at 2. Mr. Gale's procedural due process rights have been violated because Mr. Gale was never afforded notice regarding these additional reasons for his termination. These "reasons" cannot be used to support Mr. Gale's termination after-the-fact, and they should be ignored.

## II.   SUBSTANTIVE DUE PROCESS

Defendants violated Mr. Gale's substantive due process rights because Mr. Gale's termination was arbitrary, capricious, and without a rational basis. "The Due Process Clause not only provides a procedural safeguard against deprivations of life, liberty, and property but also protects substantive aspects of those interests from unconstitutional restrictions by government." *Harris v. Blake,* 798 F.2d 419, 424 (10th Cir. 1986). A public employee's property right in his or her job cannot be unconstitutionally restricted by the government; in other words, a decision to terminate cannot be "arbitrary," "capricious," or "without a rational basis." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998). "An act is said to be arbitrary and capricious when it is done for reasons that are trivial, unrelated to his or her employment or wholly unsupported by a basis in fact." *Kosidowski v. County of Washington*, Civil No. 2:06CV903, 2010 WL 564894, at *2 (D. Utah Oct. 26, 2010) (citing *Smith v. Town of Eaton*, 910 F.2d 1469, 1472 (7th Cir. 1990)).

Defendants acted arbitrarily, capriciously, and without a rational basis when they 1) terminated Mr. Gale for a first offense when they were aware Mr. Gale had no notice of any policy violation, and 2) selectively enforced a policy against Mr. Gale that they were aware many Uintah County Jail employees were violating. Drawing all reasonable inferences in favor of Mr. Gale, which this Court is mandated to do, there are genuine issues of material fact that Defendants' decision to terminate Mr. Gale was arbitrary, capricious, and without a rational basis. Contrary to Defendants' argument that the record does not support this contention, the record is replete with evidence that Uintah County

9

and Sheriff Merrell knew that 1) Mr. Gale had no knowledge that he was violating policy, and 2) other Jail employees were violating the same policy, and in some cases, more egregious policies. *See* AMF 16-21, 27, 28.

### A. It is arbitrary and capricious to hold an employee to the letter of a policy when a different, standard practice is in place.

Mr. Gale has maintained, since he first became aware that he was going to be disciplined for handing out Ibuprofen to inmates, that the "standard practice" of the Uintah County Jail had been, for at least 16 years, to provide inmates' access to Ibuprofen in a manner for which he was terminated. Dock. no. 33-6 at p. 26 (Uintah County 309; AMF 13, 26. Uintah County and Sheriff Merrell, on the other hand, have held Mr. Gale to the letter of County policy, which according to Mr. Gale, Lamar Davis, and Stephanie Jones, is different from that standard practice.  AMF 13, 27-28.  Sheriff Merrell effectively acknowledged Mr. Gale's lack of notice by asking Mr. Gale if it would "surprise" him to know about the written policy. *See* dock. no. 33-6 at 18.

Even after Mr. Gale informed Sheriff Merrell (and he learned through Isaacson's interviews) that his actions were in accordance with the standard practice of the jail, and that most, if not all, other Jail employees provided Ibuprofen similar to Mr. Gale's actions, Sheriff Merrell never investigated any other Jail employee.  AMF 20-21. Even though Sheriff Merrell knew that the County's written policy was obviously not being enforced, there was no follow-up with any other employee to see if there was a bigger problem in the Jail concerning medications.  AMF 20, 22. Sheriff Merrell, in his biased decision, failed to provide Mr. Gale with notice that his actions were violating policy;

instead, Sheriff Merrell terminated Mr. Gale for his first "offense." This arbitrary and capricious decision violates County Policy and denied Mr. Gale his substantive right to career service employment. AMF 27, 31.

### B. It is arbitrary and capricious to selectively enforce discipline for a written policy that was not being practiced, while applying inconsistent rules and punishment for similar, and in some cases more egregious, conduct.

In addition, Defendants violated Mr. Gale's substantive due process rights when they selectively enforced Mr. Gale's termination, while ignoring similar, and in some cases more egregious, conduct regarding other Jail employees. As mentioned previously, multiple inmates told Detective Isaacson, who was performing an internal affairs investigation in the Uintah County Jail, that multiple Jail employees improperly provided access to medications to inmates. AMF 16-20. One of the Jail employees was specifically identified as Amber Williams, who was the Medical Officer at the time of Mr. Gale's termination. AMF 18-20. Detective Isaacson apparently gave Sheriff Merrell this information, but no follow-up investigation, or even questioning of any other Jail employee, was ever done. AMF 20. Stephanie Jones, another Jail employee, also testified that "every single" Jail employee provided inmates access to medications for which Mr. Gale was terminated. AMF 27. It was arbitrary and capricious for Sheriff Merrell to terminate Mr. Gale when he had direct knowledge that other Jail employees were engaging in the same behavior, especially when other Jail employees admitted that they all should have been fired, if Mr. Gale's actions constituted a violation of County policy. AMF 27.

11

Defendants insist that "Sheriff Merrell cannot be expected to tolerate a corrections officer that willfully disregards policy in favor of what he believes is best . . . ." Dock. no. 33 at 36. Mr. Gale disputes Defendants' characterization of his actions, as Mr. Gale has always maintained that he had no knowledge of any policy he was violating, and he made this clear to Sheriff Merrell.  AMF 13, 26. In addition, Defendants' statement establishes the arbitrariness Sheriff Merrell used in terminating Mr. Gale because Sheriff Merrell had knowledge that Amber Williams, the Medical Officer for the Jail, was improperly handling inmates' medications.  AMF 18-20. There is no evidence that Sheriff Merrell, or anyone else in authority, even took the time to question Amber Williams about her egregious behavior.  AMF 20-21. Defendants are certainly aware by now that according to Ms. Jones, all the officers were probably giving out Ibuprofen exactly like Mr. Gale did.  AMF 27.  In light of this, Defendants claim that "Sheriff Merrell cannot be expected to tolerate a corrections officer that willfully disregards policy . . . ." has absolutely no support in the record.  Dock. no. 33 at 36.

There is also evidence that Defendants did not consistently follow Uintah County policy when it came to more severe employee misconduct.  For instance, allegations of sexual misconduct by two Jail employees was swept under the rug, with Sheriff Merrell determining that no investigation should be initiated, even though sexual misconduct is a serious P.O.S.T. violation.  Ex. C at ¶ 8. Likewise, the administration refused to discipline Ms. Williams for lying in an investigation, or a female officer sending nude photos of herself to a fellow officer, or Leonard Isaacson leaving a gun unattended around children.  *Id.*  Because Defendants selectively enforced discipline against Mr.

12

Gale for a violation of which he had no prior knowledge, the decision to terminate Mr.

Gale was arbitrary and capricious and violated Mr. Gale's substantive due process rights.

### III.    FIRST AMENDMENT RETALIATION

Summary judgment should be denied because there are genuine issues of material

fact regarding Defendants' retaliation of Mr. Gale for exercising his right to protected

speech and protected political affiliation. This Circuit applies either the

*Pickering*/*Connick* test, or the *Elrod*/*Branti* test, depending on the type of protection

alleged. *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999). Here, Mr. Gale has

alleged that the Defendants retaliated against him for exercising his right to protected

speech, and his right to protected political affiliation. Dock. no. 2 at 4-5. As such, both

tests are addressed.

Summary judgment should also be denied because Defendants do not cite to the

record at all in regards to their argument for why summary judgment should be granted

concerning Mr. Gale's First Amendment claims. It is well established that "argument of

counsel is not evidence," and cannot provide a basis for summary judgment. *Pinkerton v.*

*Colorado Dept. of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009); *Sky Harbor Air*

*Service, Inc. v. Reams*, 491 Fed. Appx. 875, 881-82 (10th Cir. 2012). While Defendants

argue that "Plaintiff's story is blatantly unsupported and contradicted by the record," they

do not point to any record evidence to support their theory. *See* dock. no. 33 at 37-41.

Summary judgment should therefore be denied on Mr. Gale's First Amendment claims.

**A. Defendants retaliated against Mr. Gale for his protected speech.**

Defendants do not address Mr. Gale's protected speech in their argument for summary judgment; therefore, summary judgment cannot be granted on Mr. Gale's First Amendment claim for retaliation for his protected speech. Regardless, summary judgment should be denied because there are genuine issues of material fact regarding Mr. Gale's protected speech.

To determine whether an employee's free speech has been infringed, courts utilize the *Pickering/Connick* four-part test. *Jantzen*, 188 F.3d at 1257. The test is:

1. Whether the speech in question involves a matter of public concern.
2. If so, we must weigh the employee's interest in the expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.
3. Employee must show the speech was a substantial factor driving the challenged governmental action.
4. If so, can the employer show that it would have taken the same employment action against the employee even in the absence of protected speech.

*Id.* (citing *Horstkoetter v. Dep't of Public Safety*, 159 F.3d 1265, 1270 (10th Cir. 1998). "The first two parts . . . are questions of law for the court; the remaining two steps are questions of fact for the jury." *Id.* (citation omitted).

In this case, Mr. Gale's political speech "undoubtedly relates to matters of public concern." *Jantzen*, 188 F.3d at 1257; *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) (The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). Mr. Gale's "interest in the expression" also outweighs Uintah County's "interest in regulating the speech." *Jantzen*, 188 F.3d at 1257. Because Defendants have not argued that they

14

have any interest in regulating Mr. Gale's speech, Mr. Gale's interest in campaigning for his chosen political affiliation outweighs such (non-existent) interest. The last two steps in the *Connick*/*Pickering* test are questions of fact for the jury. *Id.* Even so, Mr. Gale has provided sufficient evidence for a fact finder to determine that his protected speech was a substantial factor in Sheriff Merrell's decision to terminate him.

It was "common knowledge" around the Sheriff's Office that Mr. Gale actively campaigned against Sheriff Merrell.  Ex. C at ¶ 3. After Sheriff Merrell was elected in 2010, Mr. Gale filed a grievance specifically claiming he was being retaliated against him because of his campaign activities.  Ex. D. Mr. Gale's grievances were continually dismissed (*see, e.g.,* Ex. E), and Sheriff Merrell finally terminated Mr. Gale, one year after being (re-)elected as Sheriff. The fact that Sheriff Merrell never disciplined any other Jail employee for the same conduct for which Mr. Gale was terminated supports Mr. Gale's First Amendment claims; Mr. Gale was targeted for retaliation, up to termination, because he opposed Sheriff Merrell's reelection. Even one of the decision-makers testified to this.  Ex. C, ¶ 14.  Defendants have not attempted to address the last prong in the *Connick*/*Pickering* test; therefore, because they have not shown Mr. Gale would have been terminated absent his protected speech, summary judgment must be denied.

## B. Defendants retaliated against Mr. Gale for his protected political affiliation.

"The First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Jantzen*, 188 F.3d at 1251 (citation omitted). Summary judgment should be

denied in this case because there are genuine issues of material fact that Mr. Gale's political affiliation was a motivating factor in his termination, and because Mr. Gale's position did not require political allegiance. *See id.*

The Tenth Circuit has previously found genuine issues of material fact to exist when several Sheriff's Office deputies campaigned for a different candidate for Sheriff and were eventually terminated by the Sheriff who was (re-)elected. *Id.* The deputies campaigned by "making telephone calls, putting up yard signs, and doing some door-to-door campaigning." *Id.* at 1250. The *Jantzen* court correctly denied summary judgment because of the deputies' affiliation with an opposing candidate for Sheriff and the elected Sheriff's decision to terminate the deputies after he was elected. *Id.* at 1252.

Here, Defendants do not dispute that Mr. Gale supported Sheriff Merrell's opponent in the 2010 Sheriff election. *See* dock. no. 33 at 37.[4] Mr. Gale testified that he actively campaigned for Rick Reynolds, Sheriff Merrell's opponent, by purchasing and placing banners, meeting with voters, and verbally campaigning for Mr. Reynolds, similar to the *Jantzen* plaintiff-deputies.[5] Dock. no. 33-19 at 8-9; *See Jantzen*, 188 F.3d at

---

[4] Subsequently, Defendants state, "Plaintiff has not even provided evidence that the person he allegedly campaigned for ran against Sheriff Merrell in 2010." Dock. no. 33 at 38. This statement is confusing, as it obviously contradicts Defendants' stipulation that Mr. Gale supported Sheriff Merrell's opponent in the election.

[5] Additionally, Defendants essentially suggest that Mr. Gale did not "campaign enough" for Sheriff Merrell's opponent, arguing that "[t]here is [] no evidence that Plaintiff undertook a significant role in the opposing candidate's campaign." Dock. no. 33 at 40. There is no First Amendment political affiliation requirement that a plaintiff-employee must undertake a "significant role" in a campaign for the affiliation to be protected. This Circuit has recognized that even privately campaigning for a candidate for Sheriff is protected by the First Amendment. *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002). If Mr. Gale "[a]t most" claims that he

1250. Lamar Davis testified this was common knowledge in the community.  Ex. C. After Sheriff Merrell was elected, Mr. Gale and other deputies in the Sheriff's Office were targeted by Sheriff Merrell in retaliation for campaigning against him, and Mr. Gale complained to Sheriff Merrell about this retaliation.  Exs. C, D.  Uintah County, however, dismissed each of Mr. Gale's grievances.  Ex. E. Because Sheriff Merrell faced no consequences for retaliating against Mr. Gale for campaigning against him, he continued to do so, ultimately terminating Mr. Gale in 2011.

Defendants spend most of their argument distinguishing *Laidley v. McClain*, 914 F.2d 1386 (10th Cir. 1990) (superseded by rule and overruled on other grounds). Contrary to Defendants' suggestion, *Laidley* supports Mr. Gale's arguments on summary judgment. The *Laidley* court understood that summary judgment is inappropriate if an employee provides evidence which *may* show the employee's affiliation was a motivating factor in a subsequent termination. *Id.* at 1393. ("Although [the employer's] decision to terminate the plaintiff may have been for legitimate [] reasons, there is also some circumstantial evidence to suggest that plaintiff's support of [the Sheriff's] opponent may have been a motivating factor in the decision."). Because Mr. Gale has provided sufficient evidence for a reasonable fact finder to conclude that his political affiliation may have been a motivating factor in his termination (including the opinion of one of the decision-makers), summary judgment should be denied.

---

"openly supported Merrell's opponent," as Defendants suggest, his affiliation is certainly protected by the First Amendment.

17

The final prong of the *Elrod/Branti* test examines whether an employee's position requires "political allegiance." *Jantzen*, 188 F.3d at 1253. In this case, Mr. Gale's employment position did not require "political allegiance." "The defendant bears the burden of proof on whether political association was an appropriate requirement for the effective performance of the public office involved." *Id.* Here, Defendants have not argued that Mr. Gale's position within the Sheriff's Office required political allegiance; therefore, it is assumed his position did not require political allegiance. *See id.*

## IV.   IMMUNITY

Defendants Uintah County and Sheriff Merrell do not argue that either the County or the Sheriff is entitled to qualified or absolute immunity; Defendants' argument is limited to Defendant Loren Anderson's immunity. Uintah County and Sheriff Merrell have therefore waived any immunity argument for purposes of summary judgment.

Uintah County also does not address their liability under § 1983. Municipal liability for § 1983 violations arises when a municipal policy or custom caused the violation of Mr. Gale's protected rights. *David v. City & County of Denver*, 101 F.3d 1344, 1357 (10th Cir. 1996). A municipal policy may include not only policy statements, ordinances, and regulations, but also the individual decisions of city officials who have "final policymaking authority." *Id.* Because Uintah County does not address this argument, it is waived for purposes of summary judgment. *F.D.I.C. v. Noel*, 177 F.3d 911, 916-17 & n.3 (10th Cir. 1999). Mr. Gale acknowledges, however, that he has no evidence that Loren Anderson was one of the city officials with "final policymaking authority" who caused the violations of Mr. Gale's due process and First Amendment

18

rights. *David*, 101 F.3d at 1357.  Accordingly, Mr. Gale concedes that Loren Anderson should be dismissed from this lawsuit.

## CONCLUSION

For the reasons set forth above, Mr. Gale respectfully requests this Court deny

Defendants' Motion for Summary Judgment and allow Mr. Gale's claims to go to a jury.


Dated this 19th day of December, 2014.


**HOLLINGSWORTH LAW OFFICE, LLC**


 /s/ April L. Hollingsworth
April Hollingsworth
Attorneys for Plaintiff Denile Gale

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** has been served via the court's CM/ECF system, on this <u>19th</u> day of December, 2014, to the following:

Kristin A. VanOrman (7333)
Jeremy G. Knight (10722)
STRONG AND HANNI
3 Triad Center, Suite 500
Salt Lake City, Utah 84180
Telephone: (801) 532-7080
Facsimile: (801) 596-1508

/s/ April L. Hollingsworth_____

21