IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| DENILE GALE,<br><br>                    Plaintiff,<br><br><br>          vs.<br><br><br>UINTAH COUNTY, et al.,<br>                    Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:13-CV-725-TC |

In this employment discrimination case, Plaintiff Denile Gale alleges that Defendants

Uintah County and Uintah County Sheriff Jeff Merrell[1] (collectively "Defendants")[2] violated his

procedural due process, substantive due process, and First Amendment rights when they

discharged him from his job as a corrections officer at the Uintah County Jail.  He alleges that the

motivation for firing him was linked to his political activities.  The Defendants have filed a

Motion for Summary Judgment seeking dismissal of all of Mr. Gale's claims.[3]

---

[1]Sheriff Merrell is named as a defendant in his official as well as his individual capacity.

[2]Mr. Gale also named Uintah County Attorney Loren W. Anderson as a Defendant. During briefing on the motion for summary judgment, Mr. Gale agreed to dismiss Mr. Anderson from this case.  (See Pl.'s Mem. Opp'n M. Summ. J. (Dkt. No. 40) at 18-19 (conceding that Mr. Anderson should be dismissed from this lawsuit).)

[3]Mr. Gale, in his opposition to the motion for summary judgment, requests that the court impose sanctions against the Defendants based on the nature of case and record citations contained in (or not contained in) the Defendants' memorandum supporting the motion.  He asks that the sanction include a denial of the summary judgment motion and an award of fees and costs incurred in responding to the motion.  (See Pl.'s Opp'n Mot. Summ. J. (Dkt. No. 40) at x.) Although the court notes its concern about the Defendants' materially inaccurate quote of Tapia

For the reasons set forth below, the court DENIES summary judgment for Uintah County and Sheriff Merrell but GRANTS summary judgment for Defendant Loren Anderson.

## FACTUAL BACKGROUND[4]

Plaintiff Denile Gale began his service for the Uintah County Sheriff's Office in the Corrections Division in January 1995.  After sixteen years with the Sheriff's Office, he was terminated from his position as a Deputy Sheriff on December 28, 2011.  The reason stated for his termination was that he violated jail policy when he gave 800 milligram ibuprofen prescription pills to some inmates for whom the prescription had not been written.[5]  Mr. Gale asserts that Defendant Sheriff Jeff Merrell fired him because Mr. Gale actively campaigned for Sheriff Merrell's political opponent during the 2010 election.[6]  He further contends that the pre-termination and post-termination process given to him was constitutionally defective.

**The Election Campaign**

In 2010, Sheriff Jeff Merrell ran for reelection as Uintah County's Sheriff.  Rick Reynolds challenged Sheriff Merrell in the election, and Mr. Gale (while an employee of the

---

v. Beffort, No. CIV-02-0513, 2003 WL 24130246 (D.N.M. Nov. 26, 2003), the court does not find an award of sanctions appropriate in this case. Accordingly, Mr. Gale's request is denied.

[4]Because Plaintiff agrees that Uintah County Attorney Loren W. Anderson should not be a defendant in this case, the court omits facts relating to Mr. Anderson's role in the events.

[5]Although ibuprofen may be purchased over the counter, a person needs a doctor's prescription to receive and take a pill that delivers 800 milligrams in one dose.  In other words, apparently, taking four 200 milligram tablets bought at the store is not medically equivalent to taking one 800 milligram pill.  The medical reason for the distinction is not part of the record.

[6]Although Mr. Gale has named Sheriff Merrell as a defendant for his actions, Mr. Gale also brings suit against Uintah County because when Sheriff Merrell made a decision in his role as a final policy making authority, that constituted an act of the County.  Randle v. City of Aurora, 69 F.3d 441, 447 (10th Cir. 1995).)

Uintah County Sheriff's Office) actively campaigned for Mr. Reynolds.  As part of his

campaigning, according to Mr. Gale, he "purchased and placed banners, met with voters, and

verbally campaigned for Rick Reynolds."  (Pl.'s Answer to Defs.' First Set of Interrogatories

(Dkt. No. 33-19) at 9 (attached as Ex. 19 to Defs.' Mot. Summ. J.).)  He said he "was very open

outside the workplace about the fact that he was campaigning for Mr. Reynolds."  (Id.)

In 2010, county primary elections were held in June and the general election was held in

November.[7]  Sheriff Merrell won the election.

Lamar Davis, the Jail Commander at the time (he held that position for five years), knew

about Mr. Gale's support for Mr. Reynolds during the election.  "Actually, a lot of employees of

the Sheriff's Office supported Mr. Reynolds discreetly, but Mr. Gale was open and vocal about

his support of him."  (Decl. of Lamar Davis (Dkt. No. 41-3) ¶ 3 (attached as Ex. C to Pl.'s Opp'n

Mem.).)[8]  Mr. Davis provided another example of a different deputy, Nate Webb, who openly

_____

[7]See Utah Code Ann. § 20A-1-201.5(1) (2010) (as amended by 2007 Utah Laws Ch. 329 (H.B. 65) § 372) (setting forth election schedule).

[8]Defendants move to strike the Declaration of Lamar Davis (Dkt. No. 41-3) under Federal Rule of Civil Procedure 37 because Mr. Gale did not disclose Mr. Davis as a potential witness. (See Defendants' Reply Mem. Support Mot. Summ. J. (Dkt. No. 48) at xv.)   When "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added).  A district court need not make explicit findings in its decision, but four factors should be considered: (1) prejudice or surprise; (2) ability to cure prejudice, if any; (3) extent to which the testimony would disrupt a trial; and (4) bad faith or willfulness. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).
Considering the circumstances and factors listed in Woodworker's Supply, the court concludes that Plaintiff's failure to list Mr. Davis as a potential witness was harmless.  During the summary judgment motion hearing, Mr. Gale's attorney noted that the Defendants listed Mr. Davis as a potential witness in their pre-trial disclosures.  Indeed, the Defendants have known about Mr. Davis and the scope of his knowledge since before this litigation began (Mr. Davis testified at Mr. Gale's post-termination hearing).  And there is no evidence of bad faith on Mr.

supported Sheriff Merrell's challenger in the 2010 election.  That deputy was terminated before Mr. Gale was terminated.[9]

**The Medical Directive**

On July 22, 2010, Uintah County issued a Medical Directive that said "[n]o prescription medication will be given to an inmate without verification of a current and unexpired prescription in that inmate's name."  (July 22, 2010 Medical Directive, attached as Ex. 4 to Defs.' Mot. Summ. J.)  The Medical Directive also set forth a procedure to follow in case an officer had a question or needed clarification:

> For any medication received that is not on the approved list [the Medication Distribution Plan from Dr. Tubbs], P.A. [Physician's Assistant] Logan Clark must be called before giving any of that medication to the inmate.
>
> . . .
>
> P.A. Logan Clark and/or our Medical Officer should be contacted whenever there

---

Gale's part.  Accordingly, the court denies Defendants' motion to strike.  See, e.g., Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995) (failing to disclose witnesses was harmless because the party moving to strike "knew the names of [non-movant's] witnesses and the scope of their relevant knowledge well before trial" and there was no evidence of bad faith); 1993 Advisory Committee Notes to the Federal Rules of Civil Procedure (the "inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties" and "failure to list as a trial witness a person so listed by another party" are examples of harmless violations).

[9]Defendants also challenge Mr. Davis's Declaration on the basis that it is a "sham affidavit."  A sham affidavit is an affidavit submitted by a party opposing a motion for summary judgment that conflicts with the affiant's earlier sworn testimony and is an attempt to create a sham fact issue in order to avoid summary judgment.  Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty., 330 F.3d 1275, 1281 (10th Cir. 2003).  Because the Defendants raised their argument for the first time in their Reply, Mr. Gale did not have a sufficient opportunity to address the objection.  Still, based on the Defendants' characterization of the nature of testimony Mr. Davis provided at the CSRB hearing, the court finds that there is no conflict between the affidavit and the testimony.  Accordingly, the court declines the Defendants' invitation to disregard the Declaration.

is any question or uncertainty regarding the distribution of medication to an
inmate, regardless of the time of day.

(Id.)  Jail Commander Lamar Davis and Sergeant Rod Allen signed the Medical Directive.

Although the Defendants assert that the Medical Directive was given to all corrections
officers, Mr. Gale testified that he did not receive the Medical Directive until after he was
terminated from his job.  (See Dep. of Denile Gale (Dkt. No. 33-5) at 27-28 (attached as Ex. 5 to
Defs.' Mot. Summ. J.).)  A fellow officer, Stephanie Lecureux, also testified that she did not
think there were "any actual written changes to the policy and procedures" from 2009 to 2014,
when she worked for the jail, and she does not remember any written policies at all concerning
distribution of prescription medications.  (Dep. of Stephanie Lecureux (Dkt. No. 33-20) at 14-15
(attached as Ex. 20 to Defs.' Mot. Summ. J.).)

**Post-Election Grievances Filed by Mr. Gale**

After the election, Mr. Gale filed a series of complaints (grievances) with Sheriff Merrill.
In particular, his February 21, 2011 grievance to Sheriff Merrell alleged that he was being
retaliated against for his political activities in the election.  He filed it in response to his
discovery that his Terminal Agency Coordinator (TAC) access to the Utah Criminal Justice
Information System (UCJIS) (for example, his ability to reset passwords and create login names)
had been revoked by Chief Deputy John Laursen.  He also complained about what he
characterized as Chief Deputy Laursen's tolerance of two deputies' "continual jumping chain of
command."  (Feb. 21, 2011 Grievance (Dkt. No. 41-4) at 1 (attached as Ex. D to Pl.'s Opp'n
Mem.).)  Mr. Gale alleged that

[t]his is again a personal attack against a fellow employee and an abuse of his
position in violation of Uintah County, Uintah County Sheriff's department, and

Uintah County Jail policies.  Therefore, Chief Deputy Laursen's ignorance to or violations of policies places Uintah County and Uintah County Sheriff's Department in jeopardy of litigation.

(Id. at 2.)  In his grievance, he specifically noted that he had actively campaigned in the 2010 election.  "Some of Chief Deputy Laursen's actions also seem to have become elevated or show an <u>increase in aggression after the elections of 2010 and knowing of my political activities and affiliations towards the office of the Sheriff of Uintah County</u> in violation of state and federal laws.  (Id. (emphasis added).)

On March 4, 2011, Sheriff Merrell responded to Mr. Gale's "Grievance Letters."  (See Mar. 4, 2011 Mem. from Sheriff Jeff Merrell to Cpl. Denile Gale (Dkt. No. 41-5) (attached as Ex. E to Pl.'s Opp'n Mem.).)  In his response, Sheriff Merrell said:

> I have received your grievance letter dated February 21, 2011 related to the (UCJIS)(TAC) and being removed from the system as a (TAC).
>
> I have checked into the information related to the Grievance regarding the removal of your ability to reset passwords, create logins etc.  If I remember correctly the Uintah County Sheriff Office (which includes the Uintah County Jail) has only had one TAC and one assistant TAC as needed.
>
> As I recall in the time when you were on administrative leave your access to the UCJIC [*sic*] was suspended on August 7, 2009 prior to the 2010 election.  The (UCJIS) was in no way connected to the 2010 election as you have alleged.
>
> I feel as though you are causing tension and disharmony in the department by suggesting certain disciplinary actions for your co-workers.  I will be the final authority what [*sic*] is taken against whom; this is not your concern.
>
> I therefore have denied you [*sic*] grievance since I have found that nothing in your complaint is discriminatory or retaliatory in nature toward your [*sic*] or any other individual.

(Id. at 2.)

**Distribution of the Ibuprofen**

On October 2, 2011, while on duty at the jail, Mr. Gale opened a blister pack of prescription strength 800 milligram ibuprofen pills that were prescribed to one inmate and gave at least three of those pills to other inmates who did not have a prescription for that drug. He did not get signatures from the inmates to whom he gave the pills.  He did not record that information in any log.  He did not call the physician's assistant for permission.  Mr. Gale readily admitted to Sheriff Merrell that he handed out the ibuprofen, but he said he was following standard practice for the jail.

Deputy Amber Williams, the medical officer for the jail, described her understanding of the basic set-up for medication distributed in the jail.  First, the jail has "in-cell" medication including 800 mg ibuprofen tablets, all of which is prescription medication and specifically designated to a particular inmate.  (Oct. 17, 2011 Tr. of Internal Affairs Investigation Interview by Detective Leonard Isaacson of Deputy Amber Williams (Dkt. No. 41-6) at 1 (attached as Ex. F to Pl.'s Opp'n Mem.).)  Second, the jail distributed "indigent" medication defined by Deputy Williams as "over the counter stuff like sinus packs, ibuprofen 200 milligrams, acetaminophen." (Id. at 2.)  And, finally, the jail had "stock" medication, which was described as prescription medication of someone who is released from the jail and leaves the remaining prescription medication behind.  (Id.)

Detective Isaacson, during his interview of Deputy Williams, asked whether she had "ever kept a package of those blister packs [referring to a package of 800 milligram ibuprofen tablets] from stock . . . ?"  She responded, "Yes."  Then he asked, "Do you leave those blister packs in that top tray [of the medical cart] to be handed out?" and she answered "No. No. No."

(Id. at 2.)

Deputy Williams noted that the "med cart" was new to the jail[10] and had been there for maybe three to four weeks before her October 17, 2011 interview.  (Id. at 3 ("We just barely got this new cart.").)  When Mr. Gale took the ibuprofen from the top tray of the medicine cart, the cart had been in use at the jail for approximately one to two weeks.  After Deputy Williams noted that the cart was relatively new, Detective Isaacson and Deputy Williams had the following exchange:

> Q.    [W]as there a training, or a common belief [or] common understanding through vocalization that this was the process and this was the way things were gonna go?
>
> A.    <u>[W]e did not do any training on it.</u>  I lettered each drawer, in fact Lamar and I discussed having a training on it, um . . . but we didn't do it.  But each [drawer] was labeled out, and I sent out a spillman [the record does not explain this term, but from the context in which it is used, the court concludes that a "spillman" is some type of announcement distributed in some fashion to jail personnel], <u>but no, there was not any training.</u>  No.

(Williams Interview Tr. at 3 (emphasis added).)

When Detective Isaacson asked, "[w]hat's the policy on giving out prescription medication to someone else's — ," Deputy Williams responded:

> [W]e call it the four r's: right patient, right time, right dose, right medication.  Has to go to whomever the provider has written the prescription for, that's who they get.  <u>The only time that that [rule] wavers is if you do not have the on-stock and the provider signs it out to somebody else.  But they have to sign it out, whether it's verbal or whether's written, they still have to log it.</u>

(Id. at 3 (emphasis added).)

---

[10]The old jail was closed and the Sheriff's Office moved to a new building in 2011. (Lecureux Dep. at 8-9.)

Approaching the topic of last-minute distribution of medication to an inmate who needs

immediate relief from an ailment, Detective Isaacson posed the following hypothetical to Deputy

Williams, who described what she would do in such a situation:

> Q.      So let's say I got a real bad headache and I'm running a fever and I ask you
>         for an ibuprofen 800.  You have to call the provider . . .
>
> A.      Yes, Well, I . . . I personally, because of my job [as medical officer], I
>         have to go in I'll do an assessment.  And I'll do all the vitals.  I'll do a case
>         workup.  Then I'll call the doctor and report what [the inmate's] symptoms
>         are or whatever it is.  And then he, in return, will tell me, okay, she or he,
>         whoever can have 800 off stock, blah blah blah and then health care
>         request.  It just depends on what you're screening. . . .
>
> Q.      And that's over the phone.
>
> A.      Right.
>
> Q.      Does he follow it up with some written paperwork?
>
> A.      I do.  You have to log it.  Anybody has to log it.

(Id. at 4.)

As for the day in question, Deputy Williams described what she did that day and her

reason for leaving the blister pack in the medical cart:

> Because I was leaving, I knew that [inmate] Lindsey was due to have a refill and
> the state doctor brings in all of our medications every Wednesday.  K?  So I put
> his refill in because I had just done the in-cell med checks [where the deputy goes
> to each inmate's cell and dispenses medicine as prescribed on the jail's
> medication list] cuz I go in and check to make sure there's no abuse of any
> medication or they're not bartering or whatever.  And so I put this blister pack in
> the very top sliding drawer of the med cart prior to me leaving for the weekend.

(Id. at 2.)

Mr. Gale's description of that day's events is different.  Mr. Gale said Deputy Williams

"had come in and stated that she had federal court in Salt Lake, so she would not be here.  We

9

were out of indigent[11] ibuprofen.  She would leave some in the top drawer of the cabinet, some

800-milligram ibuprofens in the top drawer of the cabinet we could use if we needed too."  (Dep.

of Denile Gale (Dkt. No. 33-5) at 32-33 (attached as Ex. 5 to Defs.' Mot. Summ. J.).)  When an

inmate was in pain that evening, Mr. Gale "pulled out the bottom drawer and looked for any of

the indigent packs, and there was no ibuprofens whatsoever in there."  (Id. at 58.)  When asked

whether he checked with other staff members about the location of indigent medication, he

responded, "I'd already received the information from Amber Williams that she was going to

leave a blister pack of 800-milligram ibuprofens in the top drawer, which is where I located

them." (Id. at 59.)  Then Mr. Gale distinguished between prescription medication for present

inmates and leftover prescription medication:

> Q.    Now, that blister pack of ibuprofen 800's, those belonged to an inmate;
>       did they not?
>
> A.    All of them belonged to an inmate one way or another, yes.
>
> Q.    And so that is – I think we talked about that in the policy.  That particular
>       blister pack was another inmate's property.
>
> A.    Correct.
>
> Q.    Did you ask that particular inmate if you could give away his property?
>
> A.    It is not uncommon for us to leave labeled blister packs or keep labeled
>       blister packs for on-hand.  We did it all the time.  That, once again, is a
>       practiced policy and is not a written policy.
>
> Q.    So you would go into other inmates' personal blister packs to get what you
>       needed.

_____

[11]Deputy Williams defined "indigent" medication as "over the counter stuff like sinus
packs, ibuprofen 200 milligrams, acetaminophen." (Williams Interview Tr. at 2.)

A.      If they were kept as on-hand or placed in a specific area, and we were told
        to do it by the medical officer, then I guess we would have no choice.

. . .

Q.      . . . Your testimony is that Amber Williams told you to use Inmate
        Lindsay's blister pack for what you needed to use it for?

A.      She did not given a specific name.  She did not give any information.  She
        stated that she would leave a blister pack of 800-milligram ibuprofens in
        the top drawer for us to use.  It is not uncommon for us to leave the labels
        on on-hand medication or to rip them off, to cross them out, however.
        They would – a lot of times they would also – already have the name on it,
        but we would keep them for several years.

Q.      Okay.  Are you referring to inmates who had left?

A.      Yes.

Q.      Who were gone?

A.      Right.

Q.      Not current inmates?

A.      It would be both.  It could be both, because there would be times that a current
        inmate would have — we will say five blister packs because they didn't take them
        every day, and so we would retain numerous blister packs, and in the end, we
        would use these blister packs as on-hand, whether the inmate was there or not.

(Id. at 59-60.)

He was asked how it came about that he could use the medications that were in blister

packs with current inmates' names on the packs.  He said,

Well, it's – basically what happens in that one – and once again, I'll use you.  If
you were to take and be prescribed thirty 800-milligram ibuprofens, take one a
day, technically in one month, in thirty days, they would be all gone, but if you did
not take one every day because you didn't need it, then at the end of the month,
you have, we'll say, five left over.  If there was a refill, every thirty days that you
went and picked up, in, we'll say, ten months, you're going to have fifty tablets
that are extra.  Well, those we would turn into an on-hand or an overstock or
whatever you wanted to call it[.] . . . They called it on-hand medications ninety

11

percent of the time.  It's been called several different things, but it was just on-stock medications that we didn't throw away over the years [including ibuprofen 800's].  We did not throw them away.

(Id. at 112-13.)  Deputy Stephanie Lecureux, who worked at the jail for approximately five years, also testified in her deposition about "on-hand stuff":  "At the old jail, we had a habit of handing out the Tylenol or Ibuprofen without having to get permission because that was how we were trained, being the Ibuprofen 800 and the Tylenol was just two 350s, I think which were pre-blistered pack."  (Lecureux Dep. at 18.)  She said Mr. Gale trained her to do that when he was the medical officer.  (Id.)

When Mr. Gale was asked about the language of the Medical Directive, he responded that he had not seen the Medical Directive at that point and that the Medical Directive did not address the distribution of on-stock medicine.

> Q.    [I]f somebody were to give prescription medication to somebody who did not have a prescription for that particular medication, would that violate the law?
>
> A.    It would.  It also does not include the stuff that we kept for on-stock.
>
> Q.    Okay.  This [Medical Directive ] doesn't say there's an exception for on-stock.  It says no prescription medication.  Period.  Would you agree with that?
>
> A.    The intent is different than what was written, in my opinion.
>
> Q.    Okay.  And tell me where you get the intent.
>
> A.    The intent does not include any on-stock.  On-stock is a prescription strength but usually has no inmate's name.  Sometimes we would take them off.  Sometimes we would not. . . .   Other intent [came] from years of working with these people.

(Gale Dep. at 30-31.)

Again, the testimony of Mr. Gale's co-worker, Stephanie Lecureux, corroborates Mr.
Gale's view of the medication distribution policy and what happened the night he dispensed the
800 milligram tablets.  As noted above, her understanding when Deputy Williams left ibuprofen
in the top drawer of the medicine cart, was that it was there to be used if necessary because the
jail was out of 200 milligram tablets of ibuprofen.  Deputy Lecureux described that evening:

> A.    . . . At one point, [Deputy Williams] came into the booking area with the
> blister packs of Ibuprofen and Tylenol and said, "I am going to leave these
> in the booking area, the medical area, and then into the med room, and if
> you need these, these can be handed out to the inmates if it's like a must-
> have.
> . . .
>
> Q.    Okay.  And when she [Deputy Williams] said, "I am leaving these blister packs in
> case you need them," what that an unusual thing to say?
>
> A.    No, not at all.  It was very common we had these Ibuprofen and Tylenol in
> booking.
>
> Q.    And when you say Ibuprofen and Tylenol, do you mean the Ibuprofen 800?
>
> A.    The blister packs, yes.
>
> Q.    Okay.  Would the Ibuprofen 800 ever be kept in the medical cart as on-hand
> medication?
>
> A.    I think they were in the top drawer, actually.  For a while there, we kept them in
> the top drawer of the cart, which the top drawer was kind of like the catchall
> drawer.  And then after this whole incident, they got removed out of there.
>
> Q.    Okay.  So were you aware of other jail employees distributing Ibuprofen 800s like
> Denile Gale did?
>
> A.    <u>I am not sure how Denile distributed it, so I don't know about that, but I know that
> in the booking area, I could tell you that probably every single one of us has
> handed out an Ibuprofen 800 or the Tylenol that was blistered pack because that is
> how we were told to do it. . . . For, I mean, the five years that I was there, that is
> how we did it.</u>

13

Q.   <u>Had anyone else gotten in trouble before this, for handling them out like that?</u>

A.   <u>Not that I'm aware of.</u>

(Lecureux Dep. at 28-30 (emphasis added).)

**<u>The Investigation</u>**

Amber Williams discovered that the 800 milligram ibuprofen pills were missing from the top drawer of the medical cart, and reported it to her supervisors.  On behalf of the Uintah County Sheriff's Office, Detective Leonard Isaacson began an internal investigation.  He interviewed Mr. Gale, Sheriff Merrell, Deputy Amber Williams, P.A. Logan Clark, and four inmates.[12]  (The questions and answers of those interviewed are dispersed throughout this fact section.)

Then Sheriff Merrell reviewed the materials provided by Detective Isaacson and decided to hold an informal hearing for Mr. Gale (the Pre-Disciplinary Hearing), who had admitted during the investigation that he had distributed the ibuprofen to inmates.  Sheriff Merrell believed Mr. Gale had violated jail policy by distributing the ibuprofen without following the proper procedure (for example, failing to get permission and failing to record the information on the log).

**<u>The Termination</u>**

On December 16, 2011, Mr. Gale received a Notice of Pre-Disciplinary Hearing from Sheriff Merrell.  The pre-termination Notice alleged that on October 2, 2011, Mr. Gale provided

---

[12]The court does not rely on the prisoners' statements because, even if they are not inadmissible hearsay, as Defendants contend (<u>see</u> Defs.' Reply (Dkt. No. 48) at xvii), the statements do not add anything to the record.

800-milligram ibuprofen pills "to inmates that were not entitled to the prescribed medication." (Notice of Pre-Disciplinary Hr'g (Dkt. No. 33-11) at 2 (attached as Ex. 11 to Defs.' Mot. Summ. J.).)  The Notice said Mr. Gale had violated Uintah County Jail Policies H 05.03.00-C[13] ("Other Medication Logs and Records") and H 05.04.00-C, D[14] ("Allowing Access").

On December 22, 2011, Sheriff Merrell had the Pre-Disciplinary Hearing with Mr. Gale. Sheriff Merrell raised additional allegations about missing medical records, a topic that was not included in the Notice of Pre-Disciplinary Hearing.  The majority of the hearing was spent on the issue of missing records, but Mr. Gale did have an opportunity to respond to the allegations concerning the ibuprofen distribution.  (See Tr. of Dec. 22, 2011 Pre-Disciplinary Hr'g (Dkt. No. 33-6) (attached as Ex. 6 to Defs.' Mot. Summ. J.).)  Mr. Gale admitted that he gave the ibuprofen to the inmates, but he also emphasized that he was following a distribution policy that had been in place for the many years he had worked at the jail and that Amber Williams had given him permission that very day to distribute the 800 milligram ibuprofen tablets, which she had placed in a drawer for distribution as needed.  During the Pre-Disciplinary Hearing, Mr. Gale explained to Sheriff Merrell that, "as far as I can ever remember, if we had spare Ibuprofen 800s, we would allow the inmates to have them, and we would not document it."  (Id. at 18.)  He made it clear to Sheriff Merrell that he was following standard policy.

---

[13]That policy section says that "(1) Jail officers shall initial the medication record when the medication is accessed. (2) Inmates shall initial the medication log when receiving their medications."

[14]That policy section says that "(C). All medications, with the exception of those that an inmate may be allowed to retain in their cell, will be consumed within the sight and under the direct supervision of the officer granting access to the medication. (D). Inmate workers or 'trustees' will never handle, administer, or be given access to medications of other inmates."

15

In addition, during Detective Isaacson's interview of Mr. Gale (see transcript of interview (Dkt. No. 33-8) at pp. 80-91), Mr. Gale said that the jail's Physician's Assistant—Logan Clark—told him he could dispense 800 milligram ibuprofen tablets without calling first for permission.  (See id. at 85 (attached as Ex. 8 to Defs.' Mot. Summ. J.).)  Mr. Clark's statement to Detective Isaacson does not corroborate Mr. Gale's representation to Sheriff Merrell.  (See Transcript of Clark interview (Dkt. No. 33-10) at 1-10.)  But Mr. Clark wavers on what the procedures are and whether they are always followed and whether he would have concern about an officer giving an inmate an 800 milligram ibuprofen tablet without calling him first.  He also generally referred to his knowledge that other employees (he did not provide names or specific events) followed the same practice for which Mr. Gale was now being targeted.  Sheriff Merrell had the transcript of Mr. Clark's interview.

Six days after the Pre-Disciplinary Hearing, Sheriff Merrell sent Mr. Gale a notice that Mr. Gale's employment was terminated.  (See Dec. 28, 2011 Letter of Termination (Dkt. No. 33-12)  ("Termination Letter") (attached as Ex. 12 to Defs.' Mot. Summ. J.).)  The following individuals made the decision to fire Mr. Gale: Sheriff Merrell, Detective Leonard Isaacson, Sergeant Rod Allen, Joe McKea (the Human Resources Director), John Gothard (Assistant County Attorney), and Lamar Davis (Uintah County Jail Commander at the time).

According to Lamar Davis, although he was involved in the review of Mr. Gale's actions, he believes that Mr. Gale should not have been terminated for his actions.  "The practice of providing prescription strength Ibuprofen to the inmates is something that had been done for many years and there had been no formal training on the new procedure."  (Decl. of Lamar Davis (Dkt. No. 41-3) ¶ 11.)  He continued,

> I only went along with Mr. Gale's termination because I was the only one of the decision-makers . . . ultimately suggesting that he be given some lesser form of punishment than termination.  At the beginning of the meeting between us decision-makers, John Gothard, the Assistant County Attorney, and I both made statements indicating we did not feel that the offense was egregious enough for termination.  After a lengthy discussion and pressure from Sheriff Merrell, Mr. Gothard changed his mind.  I realized that my opinion had no weight in the process and it was clear that the other decision-makers just wanted an excuse to get rid of Mr. Gale.  I regret that I did ultimately go with the majority, knowing that if I did not, the harassment against me would continue and probably get worse.

(Id. ¶ 12.)  He backs up his assessment that the decision-makers, including Sheriff Merrell, "just wanted an excuse to get rid of Mr. Gale."  Before Mr. Gale was terminated, Mr. Davis had a conversation with Undersheriff John Laursen, who stated "'Denile might of got lucky this time, but before long he will fuck up again,[15] and then we will get him.'"  (Id. ¶ 15.)

In the Termination Letter, Sheriff Merrell wrote that Mr. Gale violated "Utah State Law" when he provided prescription medication to inmates and that such a violation was "severe." (Id.)  He further concluded that Mr. Gale's "actions in providing prescribed medication to inmates that were not entitled to the medication violated Uintah County Jail Policy H056.00.00 Prescription Medications" and that the actions "caused irreparable harm to the Uintah County Sheriff's Department and Uintah County."  (Id.)  There is no County policy numbered H056.00.00.  (Mr. McKea later clarified that although the letter contained a typographical error, the notice of the pre-disciplinary hearing listed the correct policies at issue.[16])  In the letter, Sheriff Merrell said the County was terminating Mr. Gale for cause and notified Mr. Gale of the

---

[15]According to Mr. Davis, Mr. Gale had previously been removed from his position and then reinstated some time before the ibuprofen incident occurred.

[16]See Jan. 12, 2012 Ltr. from McKea to Loni Deland (Ex. 14 to Defs.' Mot. Summ. J.).

right to file an administrative appeal.

**Post-Termination Grievance Process**

Mr. Gale appealed Sheriff Merrell's decision. The Uintah County administrative appeal process consists of four levels: (1) a pre-termination hearing with the decision maker; (2) a review of that decision by the Human Resources Director; (3) a review of that decision by the County Commissioners, with advice from the Human Resources Director; and (4) an evidentiary hearing before the Career Service Review Board (CSRB).

On January 6, 2012, Mr. Gale, through a letter from his attorney to Joe McKea, Uintah County Human Resources Director, objected to Mr. McKea's planned participation in the second and third levels of review of the Sheriff's decision. Mr. McKea was one of the decision makers who concluded that Mr. Gale must be terminated. Mr. Gale's attorney wrote to Mr. McKea,

> [Y]ou were a participant in the pre-termination hearing[17] as well as the decision to terminate. Per the procedure, <u>you would be reviewing your own decision</u>. That simply cannot pass constitutional muster per the 5th and 14th Amendments vis a' vis §42 U.S.C. 1983 [*sic*] . . . . You are also, as I understand, the advisor to the County Commission and, perhaps, the Career Services Review Board at the next levels of appeal.

(Jan. 6, 2012 Ltr. from Loni DeLand, Esq., to Joe McKea at 1-2 (Dkt. No. 33-13) (attached as Ex. 13 to Defs.' Mot. Summ. J.) (emphasis added).) Mr. Gale's attorney then requested that Mr. McKea disqualify himself "from any and all future participation in any decision-making process because of actual, or the appearance of, bias." (<u>Id.</u> at 2.)

Rather than having Mr. McKea recuse himself, the County eliminated both the

---

[17]Mr. McKea responded in a January 12, 2012 letter to clarify that he was not at the pre-termination hearing conducted by Sheriff Merrell. (Jan. 12, 2012 Ltr. from Joe McKea to Loni DeLand (Dkt. No. 33-14) at 2 (attached as Ex. 14 to Defs.' Mot. Summ. J.).)

intermediate steps of grievance review which required a review by Mr. McKea, and the review by the County Commissioners, to whom Mr. McKea was an advisor.  The County then proceeded directly to an evidentiary hearing before the CSRB.

During the appeal proceedings, Mr. Gale was represented by counsel.  Before the hearing, Mr. Gale conducted discovery.  He requested his personnel file but did not receive it until four days after the hearing.  (See Aug. 6, 2012 Ltr. from Uintah County Sheriff's Office to Loni DeLand (Dkt. No. 33-16) at 13.)  His counsel requested the presence of several witnesses, but the County did not make those witnesses available at the hearing.  The hearing, during which witnesses testified and were cross-examined, was held on August 2, 2012, and lasted one day.  At some point during the hearing, the recording device broke.  After discussions about the technical problems, Mr. Gale agreed to go forward with the rest of the evidentiary hearing.

**Career Service Review Board (CSRB) Decision**

On September 10, 2012, the CSRB issued its decision.  (See Ex. 15 to Defs.' Mot. Summ. J.)  The Board's decision listed the following undisputed facts:

- Mr. Gale administered prescription medication prescribed in another inmates [*sic*] name to inmates to whom it was not prescribed.
- Mr. Gale gave a prescription pill to one inmate to deliver to another inmate.
- The medication log was not initialed as required to determine who was given the prescription medication and who had dispensed it.

(Id. at 1.)  The Board found that Mr. Gale violated Jail Policy H 05.00.00 ("Prescription Medications")[18] and the July 22, 2010 Medical Directive.  In closing, the Board wrote:

---

[18]Jail Policy H 05.00.00, titled "Prescription Medication," has five subsections and is approximately five pages long. (See Ex. 3 attached to Defs.' Mot. Summ. J. (Dkt. No. 33-3 at 1-6).)

As a Board, we did not see acknowledgment of wrong doing by Mr. Gale.  It is the opinion of the Uintah County Career Service Board that Mr. Gale chose to ignore current procedures and tried to justify his actions based on past practices.  Due to the level of severity of Mr. Gale's actions in a highly controlled correctional institution and the potential liability created for Uintah County based on those actions, the Uintah County Career Service Board finds that the termination of Mr. Gale was warranted, and we uphold the decision made by Uintah County.

(Id. at 2.)

Mr. Gale then filed this lawsuit.

## ANALYSIS

Mr. Gale has alleged three causes of action against Uintah County and Sheriff Merrell (in his individual capacity): (1) violation of his right to procedural due process protection of his employment as a Uintah County Deputy Sheriff by failing to provide constitutionally sufficient review of the Sheriff's decision to fire him; (2) violation of his right to substantive due process by terminating him for a constitutionally inappropriate reason disguised as an alleged policy violation; and (3) violation of his First Amendment rights by terminating him in retaliation for his political activities during the 2010 election campaign in support of Sheriff Merrell's opponent.

## 1.    **Procedural Due Process**

"When determining whether the government has deprived an individual of his due process rights, the court engages in a two-pronged inquiry.  First, we ask whether the individual possessed a protected interest giving rise to due process protection.  If that question is answered affirmatively, then we proceed to the second inquiry: whether the government afforded the individual an appropriate level of process." Garcia v. City of Albuquerque, 232 F.3d 760, 769 (10th Cir. 2000).

20

   a.      **Existence of a Protected Interest**

The Defendants argue that Mr. Gale does not have a protected property interest in

continued employment with the County.  The court disagrees.

Mr. Gale, as a deputy in the Uintah County Sheriff's Office, was a merit systems officer

who could only be terminated for cause.  See Buckner v. Kennard, 99 P.3d 842, 850-51 (Utah

2004) (noting that in Utah, "employment of civil servants in Utah is governed by statute" and

holding that sheriff deputies are "statutory employees . . . governed by the Deputy Sheriffs' Merit

System Act (the Merit Act), Utah Code Ann. §§ 17-30-1 to -24 (2001), and the County Personnel

Management Act (the CPMA), Utah Code Ann. §§ 17-33-1 to -15 (2001)."); Knight v. Salt Lake

County, 46 P.3d 247, 250 (Utah Ct. App. 2002) (same).  Under Utah's Merit Act, "[a] merit

system officer holding a permanent appointment may be demoted, reduced in pay, suspended, or

discharged for" six different substantive reasons, all requiring a showing of cause to discharge.

Utah Code Ann. § 17-30-18 (2013).  See also Potts v. Davis County, 551 F.3d 1188, 1192 (10th

Cir. 2009) (holding that a sergeant with the Davis County Sheriff's Department "possessed a

property interest in continued employment with the department under" Utah Code Ann. § 17-30-

18); Kingsford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1129 (10th Cir. 2001) (when "there

are substantive restrictions on the ability of the employer to terminate the employee," a continued

expectation of employment is established); Garcia, 232 F.3d at 769 (holding that tenured city

employee who could only be discharged for cause has a constitutionally protected property

interest that may not be taken away without due process); West v. Grand County, 967 F.2d 362,

366 (10th Cir. 1992) ("[W]hen a person's employment can be terminated only for specified

reasons, his or her expectation of continued employment is sufficient to invoke the protections of

21

the Fourteenth Amendment.").  Because Mr. Gale had a protected interest in employment as a

Sheriff's deputy, he was entitled to adequate procedural due process when he was discharged

from his position in the Uintah County Sheriff's Office.

> **b.      Waiver of Right to Bring Claim In Federal Court**

The Defendants maintain that Mr. Gale waived his due process claims in federal court by

failing to appeal the CSRB's decision to state court under Utah Code Ann. § 17-33-4 (2013).

Under that statutory provision, "[a] person adversely affected by a decision of the career service

counsel [the CSRB] may appeal the decision to the district court [for the State of Utah]." § 17-

33-4(1)(d)(i).  They contend that "[b]ecause an adequate state administrative remedy existed and

Plaintiff failed to avail himself of that remedy, Plaintiff cannot now pursue a due process claim in

federal court."  (Defs.' Mot. Summ. J. at 1.)

But the state statute to which the Defendants refer is a non-compulsory statute (it says a

plaintiff "may appeal").  A plaintiff bringing a federal claim under § 1983 is not required to

exhaust non-compulsory state remedies.  Ohio Civil Rights Comm'n v. Dayton Christian Schs.,

Inc., 477 U.S. 619, 627-28 n.2 (1986) ("[L]itigants need not exhaust [non-compulsory]

administrative remedies prior to bringing a § 1983 suit in federal court") (citing Patsy v. Florida,

457 U.S. 496 (1983));  Zinermon v. Burch, 494 U.S. 113, 125 (1990) ("[O]verlapping state

remedies are generally irrelevant to the question of the existence of a cause of action under

§ 1983.");  Brown v. Day, 555 F.3d 882, 884-85, 890 (10th Cir. 2009) (holding that a federal

court need not abstain from exercising jurisdiction even when "a federal plaintiff has previously

requested a [state administrative] hearing and received a final order regarding an agency's

decision to terminate benefits.").  Even though Mr. Gale initially chose to go through the state

administrative appeal process, that choice does not foreclose his right to bring his Section 1983 claims here.

The Defendants insist that they do not make an exhaustion of remedies argument.  They argue that because Mr. Gale did not pursue his appeal to the end of all possible state levels of review, he did not take advantage of the process and does not have any basis upon which to build a complaint.  In particular, they cite to Pitts v. Bd. of Educ. of U.S.D. 305, Salina, Kansas, 869 F.2d 555 (10th Cir. 1989), and Lee v. Regents of Univ. of Cal., 221 Fed. Appx. 711 (10th Cir. 2007), to support their position.  Both cases are distinguishable.

In Pitts, the plaintiff waived any hearing, so he did not give the state an opportunity to provide him with a procedurally fair review of the termination decision.  "Pitts was fully informed of his considerable procedural rights.  Indeed, he initially asserted them.  The procedures mandated by Kansas law clearly meet the requirements of the due process clause.  By knowingly failing to take advantage of those procedures, Pitts has waived his right to challenge them in federal court."  869 F.2d 555, 557 (10th Cir. 1989).

In Lee, the court said, "[s]ince the plaintiff challenged only the propriety of the deprivation and not the adequacy of the termination process, the district court concluded that the complaint failed to state a procedural process claim."  221 Fed. Appx. 711, 713 (10th Cir. 2007).  The Lee court found that the plaintiff's "failure to allege that he had requested and been denied a post-termination hearing waived any arguments based on the lack of such a hearing" and so he did not have a Section 1983 claim to begin with.  Id. at 713-14.

23

Mr. Gale took advantage of the administrative appeal levels available to him,[19] unlike the

plaintiffs in Pitts and Lee, who did not take advantage of any process.  He now challenges those

administrative appeal procedures.  That is sufficient to maintain his procedural due process claim

in this court.

### c.      Pre-Termination and Post-Termination Process

Mr. Gale alleges that his procedural rights were violated because (1) the pre-termination

hearing officer was biased; (2) the County failed to provide basic documents and witnesses at the

evidentiary hearing despite Mr. Gale's request; (3) the County unilaterally deleted the second and

third steps in the process rather than replacing Mr. McKea with another person not involved in

the decision to terminate Mr. Gale; and (4) the County failed to record the entire evidentiary

hearing.

The fundamental requirement of due process "is the opportunity to be heard at a

meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 313, 333 (1976).

The "root requirement" of the Due Process Clause is that a party must have some type of hearing

before he is deprived of his property.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542

(1985).  "A brief face-to-face meeting with a supervisor provides sufficient notice and

opportunity to respond to satisfy the pretermination due process requirements of Loudermill."

West v. Grand County, 967 F.2d 362, 368 (10th Cir. 1992).

The appropriate level of notice and opportunity to be heard both pre-termination and post-

termination depends on the nature of the case.  Loudermill, 470 U.S. at 545.  A court must

---

[19]The court does not consider an appeal to state court to be an administrative appeal.

evaluate the constitutionality of post-termination process in light of the pre-termination

procedures it follows.  Benavidez v. City Albuquerque, 101 F.3d 620, 626 (10th Cir. 1996).  In

any event, sufficient process requires "a hearing before an impartial tribunal."  Tonkovich v.

Kansas Bd. of Regents, 159 F.3d 504, 518 (10th Cir. 1998).  See also Cypert v. Indep. Sch. Dist.

No. I-050 of Osage Cnty., 661 F.3d 477, 481 (10th Cir. 2011) ("'Impartiality of the tribunal is an

essential element of due process.'") (quoting Riggins v. Goodman, 572 F.3d 1101, 1111 (10th

Cir. 2009));  Langley v. Adams Cnty., Colo., 987 F.2d 1473, 1480 (10th Cir. 1993) (same);

Miller v. City of Mission, Kansas, 705 F.2d 368, 372 (10th Cir. 1983) ("An impartial tribunal is

an essential element of a due process hearing.");  Staton v. Mayes, 552 F.2d 908, 913-14 (10th

Cir. 1977) (a "fundamental constitutional principle" requires trial by an unbiased tribunal).[20]

The Tenth Circuit follows the three-part test in Matthews v. Eldridge, 424 U.S. 319

(1976), to determine the type and amount of procedure required by the Due Process Clause in an

administrative proceeding.  Under that test, the court must first consider the private interest that

is affected by Uintah County's actions.  Benavidez, 101 F.3d at 626.  Second, the court must

weigh "the risk of an erroneous deprivation and the value of additional procedures."  Id.  And

third, the court must weigh Uintah County's interest, "including any burden imposed by

additional procedures."  Id. at 627.

Mr. Gale's livelihood was at stake.  "[T]he Supreme Court recognized the significant

private interest in retaining employment and the 'severity of depriving a person of the means of

---

[20]The court declines to follow Riggins v. Goodman, 572 F.3d 1101, 1114-15 (10th Cir.
2009), cited by the Defendants, for support of the proposition that a neutral decision maker is not
necessary in pre-termination proceedings.  That statement is contrary to a series of Tenth Circuit
cases decided before and after Riggins.

livelihood,' explaining that '[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job.'" Id. at 626 (quoting Loudermill, 470 U.S. at 543) (emphasis added). Termination of an employee is a substantial action that merits a thorough procedural process.

On paper, Uintah County's four-step grievance process, which allows for an evidentiary hearing, is sufficient. The issue is whether the process that was actually provided fell short of constitutional standards. "A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process; the alleged violation must result in a procedure which itself falls short of standards derived from the Due Process Clause." Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986).

### 1. The Pre-Termination Hearing

The court finds that this hearing was not sufficient because Mr. Gale has established sufficient evidence that Sheriff Merrell was using the ibuprofen distribution as an excuse to fire Mr. Gale for his political activities. Although a brief face-to-face meeting may be a sufficient pre-termination process, when the court takes all reasonable inferences in Mr. Gale's favor (i.e., that Sheriff Merrell had a discriminatory agenda when he met with Mr. Gale), the court finds that the fairness of Sheriff Merrell's meeting with Mr. Gale was compromised.

### 2. The Post-Termination Process and Hearing

The fact that the County removed the steps involving Mr. McKea did not violate his due process rights because a full evidentiary hearing was slated. As for the failure to record the entire hearing, the court finds that Mr. Gale waived his right to challenge that because he agreed that the remainder of the hearing could go forward without being recorded.

But Mr. Gale's complaint about documents and witnesses is valid.  Mr. Gale did not receive his personnel file until four days <u>after</u> the evidentiary hearing.  Because his job was at stake, and his performance at his job would be relevant, his personnel file would have been a necessary part of the evidence.  But the County deprived him of the opportunity to use that information.  And the inability to take the testimony of certain witnesses, including employees of the Sheriff's Office, no doubt compromised his ability to get all relevant evidence before the CSRB.

The inability to review and present potentially relevant evidence that was in the hands of the County made the hearing constitutionally deficient, especially in light of the questionable pre-termination hearing.  Accordingly, the court finds that Uintah County and Sheriff Merrell are not entitled to summary judgment on Mr. Gale's procedural due process claim.

2.      <u>**Substantive Due Process**</u>

Mr. Gale, who is a public employee with a property interest in continued employment (and whose employment is not connected to any political affiliation), has a right to be free from termination by a decision that violates his substantive due process rights.  <u>See</u> <u>Garcia</u>, 232 F.3d 760, 770-71 (10th Cir. 2000) ("a tenured employee 'possessed a property interest deserving of substantive protections of the Fourteenth Amendment.'") (quoting <u>Tonkovich v. Kansas Bd. of Regents</u>, 159 F.3d 504, 528 (10th Cir. 1998)).  The Due Process Clause under the Fourteenth Amendment bars "'certain government actions regardless of the fairness of the procedures used to implement them.'  In its substantive mode, the Fourteenth Amendment provides protection against arbitrary and oppressive government action, <u>even when taken to further a legitimate governmental objective</u>."  <u>Seegmiller</u>, 528 F.3d at 766-67 (quoting and citing to <u>County of</u>

27

Sacramento v. Lewis, 523 U.S. 833, 840, 845-46 (1998)) (emphasis added).

  To establish a violation of his substantive due process rights, Mr. Gale must show that the Sheriff's decision was "arbitrary, or conscience shocking, in a constitutional sense." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128 (1992). "This standard is not an easy one for a plaintiff to satisfy." Ward v. Anderson, 494 F.3d 929, 937 (10th Cir. 2007) (internal quotation marks and citations omitted). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." County of Sacramento, 523 U.S. at 849. In other words,

> "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing governmental power. The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. This is a high level of outrageousness."

Ward, 494 F.3d at 937-38, quoting Camuglia v. The City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006) (internal citation and quotation marks omitted).

  The parties disagree about the breadth of the standard the court must apply. The Defendants emphasize the language used by the courts: "outrageousness," "extreme," "truly conscience shocking" in Camuglia and Ward. On the other hand, Mr. Gale cites to language in Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504 (10th Cir. 1998), to support his position that the heightened standard advocated by the Defendants is not applicable.

  In Tonkovich, which addressed a qualified immunity issue in a 42 U.S.C. § 1983 case, the Tenth Circuit Court of Appeals raised the issue of how to reconcile the "shocks the conscience" language with the seemingly contradictory "arbitrariness" language used by courts.

  There is some indication that the "shocks the conscience" standard and the

"arbitrariness" standard are used interchangeably.  See, e.g., Collins, 503 U.S. at
128, 112 S. Ct. 1061 (stating that the Court is not persuaded that the defendants'
actions "can properly be characterized as arbitrary or conscience shocking, in a
constitutional sense").  Justice Scalia's reading of the majority opinion in [County
of Sacramento v. Lewis, 523 U.S. 833 (1998),[21]] is that the shocks-the-conscience
test **"is the *measure* of arbitrariness** when what is at issue is executive rather
than legislative action." [Id. at 861] (Scalia, J., concurring) (emphasis in original).

Id. at 529 (emphasis in original and emphasis added).  But the Tenth Circuit's language in

Tonkovich is dicta.[22]

Other cases, both U.S. Supreme Court and Tenth Circuit decisions, have provided helpful

language to guide the court.  An action is conscience shocking when it is an "abuse of executive

power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the

Fourteenth Amendment."  County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998).  In

Hernandez v. Ridley, the Tenth Circuit said that "'[c]onduct that shocks the judicial conscience

. . . is deliberate government action that is arbitrary and capricious and unrestrained by the

established principle of private right and distributive justice.'"  Hernandez v. Ridley, 734 F.3d

1254, 1261 (10th Cir. 2013) (quoting Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir.

2008)) (emphasis added).  "To show a defendant's conduct is conscience shocking, a plaintiff

must prove a government actor arbitrarily abused his authority or 'employ[ed] it as an instrument

of oppression.'"  Id.

---

[21]This case was abrogated on other grounds by Saucier v. Katz, 533 U.S. 194 (2001).

[22]Tonkovich did not reach the issue about the boundaries of the standard.  Id. ("[W]e
express no opinion on whether the 'shocks the conscience' standard applies to this case because
regardless of whether we use that standard or we simply inquire whether the defendants' actions
were arbitrary or lacking a rational basis, the defendants are entitled to qualified immunity on
[the plaintiff's] substantive due process claim.").

Taking what Mr. Gale asserts as true, he distributed three prescription strength 800-milligram tablets of ibuprofen to multiple inmates one evening, did not get signatures from the inmates to whom he gave the ibuprofen, and did not call P.A. Logan Clark to get permission. He did this in keeping with a long-established and tolerated practice at the jail. He has done so in the past and there is evidence that other employees have done so as well. (See Tr. of Clark Interview (Dkt. No. 33-10) at 7-8; see also Lecureux Dep. at 30.) He did so with what he reasonably thought was Deputy Williams' blessing that very evening. He says he had no notice of the Medical Directive.

And his actions took place in relatively close temporal proximity to the election. The events pointed to by Mr. Gale start before election day (but during the campaign), when he was removed as medical officer in the Summer of 2010 (during the campaign period). The Medical Directive was issued in July 2010. The election occurred in November 2010. In February 2011, Mr. Gale filed a grievance with Sheriff Merrell, in which he stated that his access to a particular database had been revoked (that would have taken place some time between November and February), and that such a negative change in his job situation was in direct response to his political support of Mr. Reynolds. He vaguely referred to other actions taken by the Sheriff and those under Sheriff Merrell's supervision (for example, John Laursen) that he said were in retaliation for his campaigning. He refers to a quote by Deputy Sheriff Laursen[23] (although the date of that statement is not in the record). After Mr. Gale distributed the ibuprofen in October

---

[23]Before Mr. Gale was terminated, Mr. Davis had a conversation with Undersheriff John Laursen, who stated "'Denile might of got lucky this time, but before long he will fuck up again,[] and then we will get him.'" (Davis Decl. ¶ 15.)

2011, the Sheriff initiated an investigation, held a pre-termination hearing with Mr. Gale, and

terminated Mr. Gale in December 2011.   See Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329

(10th Cir. 1996) ("[P]rotected conduct closely followed by adverse action may justify an

inference of retaliatory motive.  Although we have rejected attempts to unduly stretch the 'close

temporal proximity' required under this standard, we also believe that the phrase 'closely

followed' must not be read too restrictively where the pattern of retaliatory conduct begins soon

[after the plaintiff's conduct — here, Mr. Gale's campaigning] and only culminates later in actual

discharge.") (internal citations omitted).

Termination of an employee's job for what some at the jail would consider a relatively

minor action, along with circumstantial evidence provided by Mr. Gale, suggests pretext[24] and an

ulterior motive that constitutes an abuse of power and a desire to harm someone for exercising

his First Amendment rights.  According to the U.S. Supreme Court, "a purpose to cause harm

unrelated to the legitimate object . . . will satisfy the element of arbitrary conduct shocking to the

conscience, necessary for a due process violation."   County of Sacramento v. Lewis, 523 U.S.

833, 836 (1998).  The Supreme Court has also noted that "[t]he Due Process Clause of the

Fourteenth Amendment was intended to prevent government abusing [its] power, or employing it

as an instrument of oppression."   Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126

(1992) (internal citations and quotation marks omitted).  Abusing one's power over another's

---

[24]Pretext is established if the plaintiff shows an employer's "proffered explanation is
unworthy of belief."  Randle v. City of Aurora, 69 F.3d 441, 452-53 (10th Cir. 1995) ("So long
as the plaintiff has presented evidence of pretext . . . upon which a jury could infer discriminatory
motive, the case should go to trial.  Judgments about intent are best left for trial and are within
the province of the jury."

livelihood for personal and political reasons, especially when the person is being retaliated against for expressing his political views (and when the person is protected from discharge based on political affiliation), is shocking to the conscience in the constitutional sense.  Such a termination would be "well across the line."  Adler v. Pataki, 185 F.3d 35, 44-45 (2d Cir. 1999) (denying summary judgment on substantive due process claim where plaintiff created a question of fact about whether he was fired from his job as a state employee because his spouse sued state officials for employment discrimination).

Here, Mr. Gale contends that because he openly and actively supported Sheriff Merrell's opponent in the election, the Sheriff took his job away as retaliation for exercising a constitutionally protected right.  Because Mr. Gale has established a genuine dispute of material fact regarding Sheriff Merrell's motivation in deciding to terminate Mr. Gale's employment, and because the court must draw all reasonable inferences in favor of Mr. Gale when examining the record, the court holds that a reasonable jury could find that the Defendants violated Mr. Gale's substantive due process rights.  For these reasons, the court denies the Defendants' motion for summary judgment on the substantive due process cause of action against Uintah County and Sheriff Merrell.

**3.**      **First Amendment**

Mr. Gale raises two First Amendment claims.  First, he alleges that he was retaliated for exercising his right to articulate his political views during the 2010 election. Second, he alleges that he was retaliated for his political affiliation during the election for Uintah County Sheriff.

**a.**      **Political Speech**

To determine whether Uintah County impermissibly retaliated against Mr. Gale in

violation of his First Amendment rights, this court applies the four-part test set forth by the U.S. Supreme Court in Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983). Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22, 473 F.3d 1271, 1276 (10th Cir. 2007). The court must determine whether Mr. Gale's speech involved a matter of public concern. If that threshold requirement is satisfied, the court must balance "the employee's interest in commenting upon matters of public concern against the interest of the State as an employer, in promoting the efficiency of the public services it performs through its employees." Id. Third, the court must determine whether Mr. Gale's protected speech was "a substantial motivating factor" in Uintah County's decision to terminate Mr. Gale's employment. Id. at 1277. And, fourth, if Mr. Gale meets that burden, the court must determine whether Uintah County would have taken the same action against Mr. Gale even in the absence of his protected speech. Dill v. City of Edmond, Okla., 155 F.3d 1193, 1202 (10th Cir. 1998).

The first factor has been met. Mr. Gale's political advocacy for a candidate in an election to fill the County Sheriff's office is a matter of public concern. As for the second factor, the Defendants have not pointed to anything in Mr. Gale's political activities that would affect the Sheriff's Office's ability to promote "the efficiency of the public services it performs through its employees." Deschenie, 473 F.3d at 1276. Mr. Gale has already established a question of fact about whether his political activities were a substantial motivating factor in Sheriff Merrell's decision to terminate Mr. Gale. Given the relatively minor reason for discharge based on a single incident, especially in light of evidence that Mr. Gale had no notice of the Medical Directive, that the jail had an unwritten long-standing practice that Mr. Gale was following, and that others in

33

the office had taken similar actions without discipline,[25] it seems unlikely that Sheriff Merrell would have discharged Mr. Gale for the infraction in the absence of Mr. Gale's political activities.

  **b.**  **Political Affiliation**

  Mr. Gale also alleges that he was retaliated against for political affiliation with Sheriff Merrell's opponent during the 2010 election. The court applies the test developed in Elrod v. Burns, 427 U.S. 347 (1976). Under that test, the court must determine whether his political affiliation and beliefs were substantial "motivating factors" behind the termination and whether the position required political allegiance. Poindexter v. Bd. of Cnty. Comm'rs, 548 F.3d 916, 919 (10th Cir. 2008).

  Here, there is no dispute that Mr. Gale's position as a deputy sheriff did not require political allegiance. The issue is whether Mr. Gale's affiliation with Rick Reynolds and his political beliefs concerning the race for Sheriff were substantial or motivating factors in his termination. Poindexter v. Bd. of Cnty. Comm'rs of Cnty. of Sequoyah, 548 F.3d 916, 919 (10th Cir. 2008). As the court has already found, Mr. Gale has established evidence sufficient to survive summary judgment on the question of whether his affiliation with Sheriff Merrell's opponent in the election was a substantial and motivating factor in his termination.

  Defendants Uintah County and Sheriff Merrell are not entitled to summary judgment on Mr. Gale's claim that his First Amendment rights were violated.

---

  [25]See, e.g., Lecureux Dep. at 30; Dep. of Jeff Merrell (Dkt. No. 33-18) at 37.

**ORDER**

For the foregoing reasons, the court ORDERS that Defendants' Motion for Summary Judgment (Dkt. No. 33) is DENIED as to Uintah County and Uintah County Sheriff Jeff Merrell and GRANTED as to Uintah County Attorney Loren W. Anderson.

DATED this 4th day of August, 2015.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge